## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ACCELERATION BAY LLC,         )
                                     )
               Plaintiff,     )
                                     )   C.A. No. 16-454 (RGA)
          v.                 )
                                     )   **PUBLIC VERSION**
ELECTRONIC ARTS INC.,       )
                                     )
            Defendant.    )

## PLAINTIFF ACCELERATION BAY LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY OF CATHARINE M. LAWTON

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

Aaron M. Frankel
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
 (212) 715-9100

Dated: March 23, 2018
Public version dated: April 4, 2018

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff*
Acceleration Bay LLC

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................................ 1

ARGUMENT ................................................................................................... 2

I.    EA Directly Infringes the Asserted Claims ..............................................3

      A.    EA is a Direct Infringer of the Asserted System Claims of the '497, '344, and '966 Patents ..........................................................................3

      B.    EA Directly Infringes the Asserted Method Claims in the '147 and '069 Patents ................................................................................................6

      C.    EA Directly Infringes the Computer Readable Medium Claims ........................10

II.   The Accused Products Infringe the Claims 9 and 16 of the '497 Patent ..........................10

      A.    The Accused Products Use ████████████ ████████ and Permit Players to Connect to Online Multiplayer Gameplay Sessions ...............................................11

      B.    The Accused Products Include a "Component" (Element 9A)..............................14

      C.    The Accused Products Include a Means for Identifying a Portal Computer Having a Dynamically Selected Call-In Port for Communicating with Other Computers (Elements 9B)..................................................................17

      D.    The Accused Products Include a Means for Identifying the Call-In Port by Repeatedly Trying to Establish a Connection (Element 9C)..............................19

      E.    The Accused Products Include a Means For Selecting the Call-In Port of the Identified Portal Computer Using a Port Ordering Algorithm (Element 9D)...........................................................................21

      F.    The Accused Products Include a Means for Re-Ordering the Communications Ports Selected By the Port Ordering Algorithm (Element 9E) ...........................................................................21

      G.    The Accused Products Use TCP/IP Connections and Infringe Claim 16 (Element 16)..................................................................................22

III.  Ms. Lawton's Damages Opinions Should be Excluded as Arbitrary, Unsupported by the Facts of this Case and Unreliable..............................................23

      A.    Ms. Lawton's Opinions Regarding Purported Non-Infringing Alternatives are Legally Flawed and Factually Unsupported ...................................24

B.      Ms. Lawton's Opinion that the Uniloc Verdict is Not Comparable to the Hypothetical License is Unreasonable ...................................................................28

C.      Ms. Lawton's Reasonable Royalty Opinion Rests on Speculation.......................30

D.      Ms. Lawton Assumes Comparability of the ███████████ Without Any Analysis...........................................................................................................35

E.      Ms. Lawton's Opinion as to the Date For the Hypothetical Negotiation is Unsupported and Arbitrary .................................................................................40

CONCLUSION ................................................................................................................. 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard Inc.*
(16-453-RGA) ............................................................................................ *passim*

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
797 F.3d 1020 (Fed. Cir. 2015) (en banc) ............................................7, 9, 10, 16

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................6, 10

*Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
435 F.3d 1356 (Fed. Cir. 2006) ......................................................................41

*Bowling v. Hasbro, Inc.,*
C.A. No. 05-229S, 2008 WL 717741 (D.R.I. Mar. 17, 2008) ...................32, 34, 35

*Brandeis Univ. v. Keebler Co.,*
No. 1:12-cv-1508, 2013 WL 5911233 (N.D. Ill. Jan. 18, 2013).............................28

*Centillion Data Systems, LLC v. Qwest Commc'ns Int'l, Inc.,*
631 F.3d 1279 (Fed. Cir. 2011) (en banc)..........................................................3, 5

*CyberSource Corp. v. Retail Decisions, Inc.,*
654 F.3d 1366 (Fed. Cir. 2011)........................................................................10

*DataQuill Ltd. v. High Tech Computer Corp.,*
887 F.Supp.2d 999 (S.D. Cal. 2011) .................................................................35

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ............................................................................. *passim*

*Elcock v. Kmart Corp.,*
233 F.3d 734 (3d Cir. 2000)............................................................................28

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.,*
845 F.3d 1357 (Fed. Cir. 2017)..........................................................................7

*Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp., LLC,*
No. 8:10CV187, 2016 WL 2772122 (D. Neb. May 11, 2016), *vacated in part
on other grounds,* 879 F.3d 1332 (Fed. Cir. 2018) ...............................................24

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.,*
No. 12-540-LPS, 2015 WL 1303643 (D. Del. Mar. 20, 2015)................................31

**Page(s)**

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010)...........................................................................10

*Fromson v. W. Litho Plate & Supply Co.*,
    853 F.2d 1568 (Fed. Cir. 1988).............................................................................39

*Fujifilm Corp. v. Motorola Mobility LLC*,
    No. 12-cv-03587-WHO, 2015 WL 1265009 (N.D. Cal. Mar. 19, 2015) ...............41

*Georgia–Pacific Corp. v. United States Plywood Corp.*,
    318 F.Supp. 1116 (S.D.N.Y. 1970) ...........................................................24, 36, 37

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999).............................................................................28

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
    378 F. Supp. 2d 459 (D. Del. 2005).......................................................................39

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    424 F.3d 1374 (Fed. Cir. 2005).............................................................................11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    No. 2:06-CV-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011) .................24, 28, 35

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).......................................................................36, 38

*M2M Sols. LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016).......................................................................35

*M2M Sols. LLC v. Motorola Sols., Inc.*,
    No. CV 12-33-RGA, 2016 WL 767900 (D. Del. Feb. 25, 2016) ...........................35

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008).............................................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................3

*NetAirus Techs., LLC v. Apple, Inc.*,
    No. LA CV 10-03257 JAK(Ex),
    2013 WL 11237200 (C.D. Cal. Oct. 23, 2013)......................................................36

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005).............................................................................5

Page(s)

*In re Paoli R.R. Yard PCB Litig.*,
 35 F.3d 717 (3d Cir. 1994).........................................................................................28

*Segan LLC v. Zynga Inc.*,
 No. CV 11-670-GMS, 2013 WL 12156529 (D. Del. May 2, 2013).........................16

*Sprint Commc'ns Co. v. Comcast IP Holdings, LLC*,
 No. 12-1013-RGA, 2015 WL 456154 (D. Del. Jan. 30, 2015)................................35

*Travel Sentry, Inc. v. Tropp*,
 877 F.3d 1370 (Fed. Cir. 2017)...........................................................................7, 9, 16

*Uniloc USA, Inc. v. EA*,
 No. 6:13-cv-00259-RWS (E.D. Tex.) (Dec. 5, 2014)........................................28, 29

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011)..............................................................................36

*Virnetx, Inc. v. Cisco Sys., Inc.*,
 767 F.3d 1308 (Fed. Cir. 2014)..............................................................................31

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
 609 F.3d 1308 (Fed. Cir. 2010)....................................................................34, 36, 39

**Statutes**

35 U.S.C. § 271(a) .................................................................................3, 6, 10, 16

**Other Authorities**

Federal Rule of Civil Procedure 56(a) ........................................................................3

Federal Rule of Civil Procedure 56(c) ........................................................................6

Federal Rules of Evidence Rule 702..........................................................1, 23, 27, 28

## NATURE AND STAGE OF THE PROCEEDINGS

Acceleration Bay LLC ("AB") filed suit against Electronic Arts Inc. ("EA") on March 30, 2015.  Fact discovery closed on July 31, 2017 and the parties served final expert reports on February 7, 2018.  D.I. 1 (C.A. No. 15-282), D. I. 56; D.I. 348.  Trial is set for August 27, 2018. D.I. 348.  Pursuant to the case schedule that provides for issues of validity to be addressed in the related action against Activision, Acceleration Bay previously moved for summary judgment of validity on various of Defendants' invalidity defenses.  D.I. 388.  That motion is pending before the Court.

AB now moves in this case (1) for summary judgment rejecting EA's divided infringement defense, (2) for summary judgment that each of EA's Accused Products infringe the '497 Patent and (3) to exclude the proposed opinions of EA's damages expert Catherine Lawton under *Daubert* and Rule 702 of the Federal Rules of Evidence.

## SUMMARY OF ARGUMENT

EA directly infringes each Asserted Claim because it puts into use each element of the asserted system claims and itself performs or is deemed to perform each step of the asserted method claims.  In particular, EA makes, uses and sells the video game products accused of infringement ("Accused Products"): FIFA 15 and FIFA 16 (collectively, "FIFA"); NHL 15 and NHL 16 (collectively, "NHL"); Plants vs. Zombies: Garden Warfare 1 and Plants vs. Zombies Garden Warfare 2 (collectively, "PvZ").  EA argues that its customers buy and play the Accused Products, such that they are the infringers, as opposed to EA.  But when EA's customers purchase a copy of one of the Accused Products, they actually only purchase a license to use the video game, such that EA retains complete ownership of and control over the Accused Products, including the infringing functionality in its games used to locate, join and participate in online multiplayer game sessions.  Thus, summary judgement disposal of EA's divided infringement

defense is warranted.  Doing so now will streamline the issues for trial, permitting the parties and jury to focus on the substantive infringement issues, rather than EA's meritless and unsupported defense.

Summary judgment of infringement of Claims 9 and 16 of the '497 Patent is also warranted.  There are no genuine disputes as to any material fact that the Accused Products use a matchmaking system to connect players with each other so that they can join and play an online multiplayer game session as required by Claims 9 and 16 of the '497 Patent.  EA designed and configured its matchmaking system to use a port ordering algorithm to select a call-in port of a portal computer ███████████ so that players can quickly and efficiently join a multiplayer game as required by Claim 9.  EA further designed and configured its ███████ (a portal computer with dynamically selected call-in port) to use TCP and UDP networking protocols as required by Claim 16.  Thus, summary judgement of EA's infringement of the '497 Patent is proper.

Additionally, the Court should preclude EA's damages expert Ms. Lawton from providing fundamentally flawed and unreliable opinions in rebuttal to AB's experts.  EA's damages expert provides an improper damages calculation that is based on arbitrary and speculative calculations untethered to the facts of the case, premises her entire opinion on a license agreement that is neither technically nor economically comparable to the hypothetical negotiation for this case, and offers technical opinions on non-infringing alternatives and validity that lack any factual basis and for which she concedes she is unqualified to provide.

## **ARGUMENT**

The Court should grant AB's motions for summary judgment because "there is no genuine dispute as to any material fact and [Acceleration Bay] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As movant, AB bears the burden of demonstrating the absence of

a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10, 586 (1986). EA must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587.

## I.     EA Directly Infringes the Asserted Claims

### A.     EA is a Direct Infringer of the Asserted System Claims of the '497, '344, and '966 Patents

EA is liable as a direct infringer under 35 U.S.C. § 271(a) of the asserted system claims in the 497, '344, and '966 Patents. The Federal Circuit has held that infringing activity is directly attributable to an accused infringer, like EA, who controls the accused system and derives a benefit from the use of the accused system. *Centillion Data Systems, LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (en banc).

EA owns and controls the design and operation of the Accused Products, including the multiplayer networks at issue, and puts into use the systems accused of infringement. In particular, the accused systems generally include the following elements that are all under the control and put into use by EA's Accused Products:

- **'497 Patent**: a software component for locating a call-in-port of a portal computer with dynamically selected call-in ports;

- **'344 Patent**: a computer network broadcast channel for playing a game that permits participants to send and receive data; and

- **'966 Patent**: a computer network broadcast channel for a topic of interest that permits participants to send and receive data

The operation and function of every element of the above system claims, including any hardware or processors required by the means-plus-function claim elements, are controlled by software in the Accused Products. EA does not dispute Drs. Medvidovic's and Mitzenmacher's analysis that EA own and controls the operation of the Accused Products:

> The customers' use of the software, which Defendant exclusively authors, owns, updates, and modifies, is subject to a license agreement. ███████████████████████

Ex. 1 (Med. Rpt.) at ¶ 322; *see id.* at ¶¶ 331, 340; Ex. 3 (Mitz. Rpt.) at ¶¶ 207, 214, 225.

The customers' use of the software, which Defendant exclusively authors, owns, updates, and modifies, is subject to a license agreement. I have provided below representative relevant excerpts of EA's User Agreement for its customers. Customers must agree to the User Agreement to use FIFA which further demonstrates Defendant's ownership, direction and control over the software.

EA's own witnesses (Messrs. O'Neill, Clouatre, and Smith) and experts, Drs. Kelly and Macedonia admit that EA masterminds the entire system put into use by the Accused Products:



Ex. 9 (Kelly Rpt.) at ¶ 93 (emphasis added); Ex. 10 (Macedonia Rpt.) at ¶ 150.

EA's experts confirm EA's control over these systems by repeatedly explaining in their reports that EA's game teams configure all aspects of the design and operation of the accused systems, from joining a game (e.g., locating and connecting to a portal computer), to forming and maintain connections (e.g., broadcast channel for a game of interest that is m-regular and incomplete graphs) and controlling the sending and receiving of data (e.g., relaying data among participants).  *See, e.g.,* Ex. 9 (Kelly Rpt.) at ¶¶ 100, 104, 110, 117, 125; Ex. 10 (Macedonia Rpt.) at ¶¶ 157, 161, 167, 174, 182.  EA's experts further confirm that EA's ███████████

█████████████████████████████████████████████████████████

████████████████████████████████  *Id.*  Thus, there can be no genuine dispute that EA controls and put into use the accused systems.

EA's contention that it does not put into use the accused systems because it does not have possession over its customers' PCs and consoles should be summarily dismissed.  The Federal Circuit has held that physical control over every component in an accused system is ***not*** required.  *Centillion*, 631 F.3d at 1284.  To the contrary, the Federal Circuit has held that a user puts a system into use even if the user "remotely 'controlled' the system by simply transmitting a message":

> the user did not have physical control over the relays, the user made them work for their patented purpose, and thus "used" every element of the system by putting every element collectively into service

*Id.* (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)).

Here, that EA's customers may own their own PCs and Xbox consoles does not impact EA's liability because Acceleration Bay's experts provided unrebutted evidence that (1) EA owns and controls the application programs that execute on its customers' PCs and consoles to create and participate in the infringing networks; (2) EA owns and controls the servers providing

the networks, (3) EA puts the systems into use and (4) EA masterminds and controls all aspects

of the operation of the networks.  Ex. 1 (Med. Rpt.) at ¶¶ 321-323, 330-332, 339-341; Ex. 2

(Med. Reply Rpt.) at ¶¶ 47, 137, 156, 332-336; Ex. 3 (Mitz. Rpt.) at ¶¶ 78, 79, 87, 88, 96, 97; Ex.

4 (Mitz. Reply Rpt.) at ¶¶ 38, 39, 41, 47-49, 54-57, 59, 62-64, 68, 84-85; Ex. 9 (Kelly Rpt.) at ¶

93; Ex. 10 (Macedonia Rpt.) at ¶ 150.

Further, EA benefits from the use of the accused systems which provide significant cost

savings and enhances the gaming experience which EA uses to generate hundreds of millions of

dollars in revenue.  Ex. 5 (Bims Rpt.) at ¶¶ 2, 3, 49-61; Ex. 7 (Meyer Rpt.) at ¶¶ 11, 13, 24-31,

48.  Thus, use of the entire accused system is attributable to EA and the Court should grant

summary judgment dismissing EA's divided infringement defense.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986) (summary judgment appropriate when "'the pleadings,

depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine

issue as to any material fact and [movant] is entitled to judgment as a matter of law.'") (quoting

Fed. R. Civ. P. 56(c)).

**B.     EA Directly Infringes the Asserted Method Claims in the '147 and '069 Patents**

EA is liable as a direct infringer under 35 U.S.C. § 271(a) of the asserted method claims

in the '147 and '069 Patents.  EA controls the operations of its customer's PCs and consoles,

including connecting and disconnecting to online multiplayer game sessions, as recited in these

claims.  The Federal Circuit has repeatedly held that actions of third parties (e.g., customers' PCs

and consoles) are attributable to an alleged infringer "when an alleged infringer conditions

participation in an activity or receipt of a benefit upon performance of a step or steps of a

patented method and establishes the manner or timing of that performance."  *Akamai Techs., Inc.*

*v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (en banc) (citation omitted).

Through its Accused Products, EA controls the manner and operation of customers' PCs and consoles, allowing them to obtain the benefit of connecting to the network and joining online multiplayer game sessions, including the manner and timing of the processes covered by the '147 and '069 Patents:

- **'147 Patent**: controlling the process of disconnecting and maintaining an m-regular graph; and

- **'069 Patent**: controlling the process of adding a participant.

As described above, EA's witnesses and experts agree that EA owns its software, and, for each of the Accused Products, EA controls the process of connecting, forming and maintaining the network for playing online multiplayer game sessions.  Ex. 3 (Mitz. Rpt.) at ¶¶ 78, 79, 87, 88, 96, 97; Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 38, 39, 41, 47-49, 54-57, 59, 62-64, 68, 84-85; Ex. 1 (Med. Rpt.) at ¶¶ 321-323, 330-332, 339-341; Ex. 2 (Med. Reply Rpt.) at ¶¶ 47, 137, 156, 332-336.  Thus, any actions by EA's customers' PCs and consoles, including hardware and processor, is controlled by EA's software and attributed to EA for purposes of infringement.  *Akamai*, 797 F.3d at 1023; *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357 (Fed. Cir. 2017); *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1378-79 (Fed. Cir. 2017).

EA exclusively authors, owns, updates, and modifies the Accused Products.  Ex. 3 (Mitz. Rpt.) at ¶¶ 206-208, 213-215, 224-226.  EA's customers' use of these products is conditioned upon their agreement to a restrictive license agreement.  Relevant excerpts of EA's User Agreement for its customers, copied below, confirm that (1) customers must agree to the User Agreement to use the Accused Products, (2) EA owns the software and only sells to its customers a license and (3) EA can modify the software at any time, demonstrating EA's ownership, direction and control over the software running customer's PCs and consoles.

██████████████



Ex. 11, EA0039556-66 (Channon Ex. 11) (emphasis added); *see also* Ex. 12, AB-EA 008408-19

(http://tos.ea.com/legalapp/WEBTERMS/US/en/PC/); Ex. 13, EA0039531-44 (Channon Ex. 9);

Ex. 14, EA0039545-55 (Channon Ex. 10); Ex. 15, Channon Tr. at 34:12-37:24.

　　　　Based on the requirements, EA has and maintains total control over all relevant aspects of

the software that directs the manner in which players' PCs and consoles connect to online game

sessions.  For example, as discussed in Sections II.C, II.D (Elements 497:9(b)-(c) below), ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 16, Poon Tr. at 44:25-45:8;

Ex. 17, EA0023770-77; Ex. 18 at EA0023800-801; *see also* Ex. 19, O'Neill Tr. at 67:22-25,

69:4-14; Ex. 16, Poon Tr. at 14:10-15:11; Ex. 20, EA0023662-72; Ex. 21, EA0023653; Ex. 22,

EA0023538; Ex. 23 at EA0023564-65, 572-73.

Both EA and its customers benefit by using this technology because it allows EA's customers to participate in the activity of joining and playing online multiplayer game sessions more efficiently (e.g., networks can be formed where the overlay layer is agnostic as to the topology of the underlying network) and with enhanced performance (using dynamically selected call-in ports result in shorter wait times to join game and form networks with lower latency (they are "faster")).  Ex. 4 (Mitz Reply Rpt.) at ¶¶ 296-299, 303.

Because EA controls the actions and processes of players' PCs and consoles, and requires use of its software to join an online multiplayer game session, the action and processes that are performed by players' hardware, including processors, are attributable to EA.  *Akamai*, 797 F.3d at 1023; *Travel Sentry*, 877 F.3d at 1378-79.

Indeed, the facts here provide even more compelling support for direct infringement than those in *Akamai* and *Travel Sentry*.  In those cases the deliberate and volitional actions of third parties were attributed to the alleged infringer.  *Akamai*, 797 F.3d at 1024; *Travel Sentry*, 877 F.3d at 1376, 1379-80.  Here, in contrast, because EA's software controls customer's PCs and consoles to automatically perform the claimed functions, and customers have little to no role in the process by which their PC or console connects to an online game session.  For example, in *Akamai*, customers themselves performed the active and volitional "tagging step" – it was not automatic, yet those actions were attributable to the alleged infringer because the customers would only benefit from use of the system upon performing the tagging step.  *Akamai*, 797 F.3d at 1024-25.  EA's customers can only benefit (i.e., joining and playing an online game session), by using EA's software to connect to a gameplay session.  That joining process happens without input from the player as to the steps recited in the Asserted Claims (unlike a user-performed tagging step).  As this process is automatic, EA's customers must perform these steps to get the

benefit of playing the Accused Products.  EA therefore conditions its customers participation in the infringing multiplayer game sessions on their use of the Accused Products to connect to those networks, causing EA to be deemed to itself perform these steps.  *Id*., at 1023.

### C.    EA Directly Infringes the Computer Readable Medium Claims

EA is liable for direct infringement under 35 U.S.C. § 271(a) for the asserted "computer readable medium" ("CRM") claims, which are Claims 11, 15, and 16 of the '147 Patent and Claims 19 and 22 of the '634 Patent because EA manufactures or causes to be manufactured the disks and provides the game for download.  Ex. 1 (Med. Rpt.) at ¶¶ 316-318, 570, 572, 574; Ex. 3 (Mitz. Rpt.) at ¶¶ 297-299; *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010) (direct infringement of computer readable medium *Beauregard* claims may be shown by the manufacture or sale of computer readable medium that contains software capable of performing the recited functions).[1]

## II.    The Accused Products Infringe the Claims 9 and 16 of the '497 Patent

As shown below, the Accused Products meet every limitation of Claims 9 and 16 of the '497 Patent.  Therefore, the Court should grant summary judgment that EA infringes Claims 9 and 16 of the '497 Patent.  *Anderson*, 477 U.S. at 247-48.  Below is an overview of EA's matchmaking process used in the Accused Products, followed by a discussion of the specific claim elements.

AB's technical expert Dr. Michael Mitzenmacher provided overwhelming evidence that FIFA, NHL, and PvZ meet every element of Claims 9 and 16 of the '497 Patent, either literally or under the doctrine of equivalents (DoE).  AB's motion for summary judgment of infringement is confirmed by the source code Dr. Mitzenmacher analyzed in his reports, the admissions of

---

[1] For purposes of patent eligibility, these claims are method claims in the form of *Beauregard* claims.  *See* D.I. 475 (16-cv-453) at 31-33; *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373-75 (Fed. Cir. 2011).

EA's corporate designees and EA's technical documents.  As such, there is no issue of material fact and summary judgment of infringement is appropriate.  *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005) (affirming summary judgment of infringement where there was no genuine material dispute that the accused product practiced all claim limitations).

Claims 9 and 16 recite the following limitations, each of which are found in the Accused Products, as discussed below.  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

| |
|---|
| [Element 9(a)]. A component in a computer system for locating a call-in port of a portal computer, comprising: |
| [Element 9(b)]. means for identifying the portal computer, the portal computer having a dynamically selected call-in port for communicating with other computers; |
| [Element 9(c)]. means for identifying the call-in port of the identified portal computer by repeatedly trying to establish a connection with the identified portal computer through contacting a communications port or communications ports until a connection is successfully established; |
| [Element 9(d)]. means for selecting the call-in port of the identified portal computer using a port ordering algorithm; and |
| [Element 9(e)]. means for re-ordering the communications ports selected by the port ordering algorithm. |
| [Element 16]. The component of claim 9 wherein the communications ports are TCP/IP ports. |

**A.     The Accused Products Use** ████████████████████████████
████████████████████████**and Permit Players to Connect to Online Multiplayer Gameplay Sessions**

When EA's customers want to join and participate in an online multiplayer session for one of the Accused Products, the customer can only connect with other players by ████████████

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████ Ex. 3 (Mitz. Rpt.) at ¶¶ 70-75; Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 26-29, 38-45.[2]



**Figure A,** Ex. 24 at EA0033641

The PCs and consoles then connect to a port ████████████████████████

████████████████████████████████████████ Ex. 16, Poon

Tr. at 46:2-24; *see also* Ex. 36, Smith Tr. at 38:15-39:18; Ex. 9 (Kelly Rpt.) at ¶ 105. ████████

███████████████████████████████████████████

---

[2] *See, e.g.*, Ex. 24, EA0033641 (FIFA Network Diagram); Ex. 25, EA0033930 (FIFA 15 Architecture Review); Ex. 26, EA0033820-31 (NHL Architecture Review); Ex. 27, EA0033897-905 (NHL 16 Game Services Questionnaire); Ex. 28, EA0033906-08 (NHL 16 Review Questionnaire); Ex. 29, EA0033951-61 (NHL Game Services Architecture Review); Ex. 30, EA0032813-15 (PvZ Online System Architecture); Ex. 31, EA0033962-66; Ex. 32, EA0033909-13; Ex. 33, EA0033967-71; Ex. 34, EA0033914-17; Ex. 35, EA0033595-97.

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

     The Accused Products have different multiplayer modes (e.g., number of players) and options, but EA's experts agree that the general matchmaking process described above applies to all of the Accused Products and are required to join a game.  Ex. 9 (Kelly Rpt.) at ¶¶ 104-107. For example, to join an online game session in PvZ, players must use EA's matchmaking process which is illustrated below.



     In FIFA, a player joining an online game must also use EA's matchmaking process, which is sometime referred to as "Match Lobbies" or "Lobby," as shown below.



Likewise, in NHL, players must use EA's matchmaking service as illustrated below:



Ex. 38 at EA0023383.  This matchmaking process is the only way for players to connect to an online multiplayer game session, and, as shown below, satisfies each element of Claims 9 and 16 of the '497 Patent.

### B.    The Accused Products Include a "Component" (Element 9A)

The Accused Products include software to connect to the ▮▮▮▮▮▮▮▮▮computer, as discussed above.  This is a component in a computer system for locating a call-in port of a portal computer, as recited in Claim 9 of the '497 Patent.  Ex. 4 (Mitz Reply Rpt.) at ¶¶ 38-45.  Indeed, Dr. Kelly agrees that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 9 (Kelly Rpt.) at ¶ 105; Ex. 43 (Rough Kelly Tr.) at 34:16-35:15, 118:12-120:3.

As discussed above in Section I(A), EA owns and controls the software in the Accused Products and, therefore, satisfies this element.  When EA customers "purchase" one of the Accused Products, they are actually only purchasing a license to use the game and customers are not permitted to alter the design and operation of EA's matchmaking service.  Ex. 3 (Mitz Rpt.) at ¶¶ 206-207, 213-214, 224-225.  EA retains ownership of and complete control over the software.  *Id.*  EA's customers can only join an online multiplayer game session when customers use EA's software, including the ███████████████████████████████████████████ ████████████████████████ *Id.* at ¶¶ 70-75; Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 26-29, 38-45.[3] Other than this one process completely controlled by EA, there is no independent method for a player to access game sessions for the Accused Products.  Ex. 3 (Mitz Rpt.) at ¶¶ 206-207, 213-214, 224-225; Ex. 4 (Mitz Reply) at ¶ 68.  EA owns and operates its ███████████████ ████████  Ex. 3 (Mitz Rpt.) at ¶¶ 70, 72, 74; Ex. 4 (Mitz Reply) at ¶ 59.

EA's sale of software to its customers and operation of and control over the matchmaking process gives rise to infringement.  Ex. 3 (Mitz Rpt.) at ¶¶ 206-207, 213-214, 224-225; Ex. 4 (Mitz Reply) at ¶ 68.  Although the Court construed "a component in a computer system for locating a call-in port of a portal computer" to be "a hardware component programmed to locate a call-in port of a portal computer," as discussed above, this element is literally satisfied because customers' PCs and consoles include hardware components such as processors that are

---

[3] *See, e.g.*, Ex. 37 (Clouatre Tr.) at 36:19-22 ███████████████████████████████ ████████████████████████  Ex. 16 (Poon Tr.) at 18:16-19:13, 24:14-16, 25:16-26:11, 27:6-9, 57:18-58:21; Ex. 41 at EA0023242 ████████████████████████████████ █████████████████████████  Ex. 36 (Smith Tr.) at 28:5-20, 26:18-27:11, 31:16-32:2, 32:11-16, 45:18-46:13; Ex. 39 at EA0023484 ("Build, Manage, and Compete against others in HUT online seasons and playoffs.  You can play against your friends' ultimate fantasy team, and compete against other user-made teams by downloading them with EAUHL 24/7."); Ex. 40 at EA0023402 (HUT Online Seasons and Playoffs; "You can also challenge a friend to an online match through Play a Friend."); Ex. 42, Lo Tr. 15:14-18 (both versions of PvZ ██████████████████████████; Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 26-28, 36, 38-49.

programmed by EA's software to locate a call-in port of a portal computer.  Ex. 4 (Mitz Reply Rpt.) at ¶¶ 38-45; *see also id.* at ¶¶ 47-49, 52-55.  EA makes, owns and puts these software components into use because it makes and owns the software.  Ex. 3 (Mitz Rpt.) at ¶¶ 206-207, 213-214, 224-225.

Moreover, EA controls the process and conditions participation in its online gameplay session by requiring its customers to the use of components for locating a call-in-port of a portal computer.  *Akamai*, 797 F.3d at 1023; *Travel Sentry,* 877 F.3d at 1378-79.

Additionally, EA's , a web server, is another hardware component in a computer system for locating a call-in port of a portal computer.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4 (Mitz Reply Rpt.) at ¶ 47; Ex. 9 (Kelly Rpt.) at ¶ 104.

EA further infringes through its own use and testing of the Accused Products using hardware components such as PCs and consoles (including processors) running the software. Ex. 4 (Mitz Reply Rpt.) ¶¶ 52-55; *Segan LLC v. Zynga Inc.*, No. CV 11-670-GMS, 2013 WL 12156529, at *1 n.1 (D. Del. May 2, 2013) (accused infringer's "accessing of its own games is sufficient" to constitute "use" under § 271(a)).

EA also satisfies this element under the doctrine of equivalents ("DOE") because the software in its Accused Products is equivalent to a component in a computer system for locating a call-in-port of a portal computer because modern hardware (such as processors) execute code to perform various functions.  Ex. 4 (Mitz Reply Rpt.) ¶¶ 52-55, 62-64.  EA's software is specifically designed to control the hardware in PCs and consoles to perform various functions and a person of ordinary skill in the art (POSA) would understand that software to control the

operation of a process is equivalent to a processor that is controlled by software.  *Id.*; *see also id.*

at ¶¶ 47-49; Ex. 21, EA0023653; Ex. 22, EA0023538; Ex. 18 at EA0023803 

██████  Ex. 23 at EA0023564-65 ████████████████████████ and EA0023572-73

(Player Count Rule; Total Player Slots Rule); Ex. 17 at EA0023771-72 (Creating the Lobby;

████████████████████; Ex. 18 at EA0023801; Ex. 44 at MSFT/ACCELERATION BAY

000122; Ex. 45 at MSFT/SUB ACCELERATION BAY 000160-65 ███████████████

████████████████████  Ex. 36, Smith Tr. at 26:18-27:11, 31:16-32:2, 32:11-16, 45:18-46:13;

Ex. 19, O'Neill Tr. at 67:22-25, 69:4-14; Ex. 20, EA0023662-72.

Thus, there is no genuine dispute that the Accused Products include a component for

locating a call-in port of a portal computer.

### C.    The Accused Products Include a Means for Identifying a Portal Computer Having a Dynamically Selected Call-In Port for Communicating with Other Computers (Elements 9B)

The Accused Products perform the function of "identifying a portal computer."  The

software in the Accused Products control and program a processor to perform the algorithm

described in the '497 Patent at 12:34-36 and 12:49-5 (identified by the Court as the structure

corresponding to this element) by requiring the seeking computer to obtain a list of portal

computers to connect to and selecting the port number of the portal computer using a port-

ordering algorithm.  D.I. 275 at 3-4; Ex. 3 (Mitz Rpt.) at ¶¶77-79, 87-90, 96-99; Ex. 4 (Mitz.

Reply Rpt.) at ¶¶ 34-35, 52-64.

As explained above, players joining a multiplayer session must use EA's ███████████

████████████████████████████████████ (a portal computer).  Ex. 3 (Mitz.

Rpt.) at ¶ 81 (citing Poon Tr. 44:25-45:8; EA0023770-777; EA0023797-821 at 801; *see also*

O'Neill Tr. 67:22-25, 69:4-14; Poon Tr. 14:10-15:11; EA0023662-672; EA0023653;

EA0023538; EA0023563-617 at 564-65, 572-73; EA0023797-821 at 803)[4]; Ex. 37, Clouatre Tr.

at  36:19-22; Ex. 9 (Kelly Rpt.) at ¶ 104. 

Ex. 3 (Mitz. Rpt.) at ¶¶ 78-86 (FIFA); ¶¶ 87-95

(NHL); ¶¶ 96-104 (PvZ); Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 38-45; Ex. 16, Poon Tr. at 44:25-45:8;

Ex. 17, EA0023770-77; Ex. 18 at EA0023801; *see also* Ex. 19, O'Neill Tr. at 67:22-25, 69:4-14;

Ex. 16, Poon Tr. at 14:10-15:11; Ex. 20, EA0023662-72; Ex. 21, EA0023653; Ex. 22,

EA0023538; Ex. 23 at EA0023564-65, 572-73; Ex. 18 at EA0023803.

EA's experts concede that the Accused Products

Ex. 9 (Kelly Rpt.) at ¶ 288;  Ex. 43 (Rough Kelly Tr.) at 45:6-21.

Ex. 3 (Mitz

Rpt.) ¶¶ 78, 87, 96; Ex. 4 (Mitz Reply Rpt.) at ¶¶ 27-32; Ex. 43 (Rough Kelly Tr.) at 41:13-44:3.

Specifically, there are multiple ports

Ex.

9 (Kelly Rpt.) at ¶ 399; Ex. 43 (Rough Kelly Tr.) at 41:13-44:3.  Further, Dr. Kelly

acknowledges that the consoles and PCs operating under the control of the Accused Products

repeatedly

---

[4] *See* Exhibits 16-23.

█████ Ex. 3 (Mitz. Rpt.) at ¶¶ 71, 73, 75; Ex. 46 (Mitz. Tr.) at 63:14-64:15; Ex. 43 (Rough Kelly Tr.) at 44:7-22, 46:8-48:12.  By repeatedly trying to connect to a █████ customers' PCs and consoles obtain the particular address and port.  Ex. 9 (Kelly Rpt.) at ¶¶ 104-105, 142-151, 288, 399; Ex. 4 (Mitz Reply Rpt.) at ¶¶ 44-45, 55-57.  Thus, EA's ████████ ████████ literally infringe this claim element.  Further, the port ordering algorithm for selecting the call-in port for communicating with other computers first attempts to try one port and then performs an ordering of a specific selection of ports to identify the dynamically selected call-in-port.  Ex. 3 (Mitz. Rpt.) at ¶¶ 78, 84, 87, 93; Ex. 46, Mitz. Tr. at 43:15-44:15.[5]  Thus, functionality is described in documents obtained from Microsoft.  Ex. 44 at MSFT_ACCELERATION BAY 000122; Ex. 45, MSFT/SUB ACCELERATION BAY 000160-65 ████████████████████ Ex. 47, MS/SUB ACCELERATIONBAY 000105-12.

### D.    The Accused Products Include a Means for Identifying the Call-In Port by Repeatedly Trying to Establish a Connection (Element 9C)

The Accused Products perform the function of identifying the call-in-port of the identified portal computer by repeatedly trying to establish a connection with the identified portal computer through contacting a communications port or ports until a connection is successfully established through the ████████████████ ████████  Ex. 3 (Mitz. Rpt.) at ¶¶ 108-115; Ex. 4 (Mitz Reply Rpt.) at ¶¶ 68-71.  As explained above, the Accused Products do so by repeatedly attempting to connect to ports per the port ordering algorithm until a connection is made.  *Id.*

---

[5] Dr. Kelly concedes that the same port connection process is used for both Xbox and PC.  Ex. 9 (Kelly Rpt.) at ¶ 104 ████████████████████

Specifically, when a player seeks to join an online multiplayer game session, ███

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████; Ex. 9 (Kelly

Rpt.)  ¶¶ 104-107; Ex. 3 (Mitz Rpt.) at ¶¶ 69-104; Ex. 4 (Mitz Reply Rpt.) at ¶¶ 24, 31, 34, 57.

As explained in EA's documents (Ex. 17 - EA0023770-777), the programs will repeatedly try to

establish a connection: █████████████████████████████████



In addition, when a player seeks to join an online game session, a player's PC or console

also repeatedly attempts to connect to the ███████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████ until a connection is successfully

established (corresponding to the '497 Patent at 12:46-65).  D.I. 394, Ex. 22 to 2/2/18 Andre

Decl., '497 Patent; Ex. 4 (Mitz Reply Rpt.) at ¶¶ 80-81.

Thus, the Accused Products include a means for identifying the call-in port of the

identified portal computer by repeatedly trying to establish a connection with the identified

portal computer through contacting a communications port or communications ports until a connection is successfully established.

### E.   The Accused Products Include a Means For Selecting the Call-In Port of the Identified Portal Computer Using a Port Ordering Algorithm (Element 9D)

The Accused Products use a rule-based procedure for generating an order of portal computer call-in ports in a non-random manner to connect to the ███████████portal computer. Ex. 3 (Mitz. Rpt.) at ¶¶ 119-121 (FIFA); ¶¶ 122-124 (NHL); ¶¶ 125-127 (PvZ).  For example, for Xbox devices, the use of a port ordering algorithm will generate a sequence of portal computer ports, i.e., 1025-1255 and greater than 5000.  Therefore, the Accused Products use a rule-based procedure for generating an order of portal computer call-in-ports in a non-random manner.  *See id.*; *see also* Ex. 4 (Mitz Reply Rpt.) at ¶¶ 80-81; Ex. 47, MS/SUB ACCELERATIONBAY 000105-12.  As noted above, Dr. Kelly concedes that the same port connection process is used for both Xbox and PC.  Ex. 9 (Kelly Rpt.) at ¶ 104.

### F.   The Accused Products Include a Means for Re-Ordering the Communications Ports Selected By the Port Ordering Algorithm (Element 9E)

The Accused Products perform the function of using the call-in port number generated by the port ordering algorithm, and if the connection is unsuccessful, reordering the communication ports by re-ordering the communications ports selected by the port ordering algorithm.  Ex. 4 (Mitz Reply Rpt.) at ¶¶ 80-81; Ex. 3 (Mitz Rpt.) at ¶¶ 119-121 (FIFA); ¶¶ 122-124 (NHL); ¶¶ 125-127 (PvZ); *see also* Ex. 47 at MS/SUB ACCELERATIONBAY 000108-09.

To improve efficiency and avoid collisions, the ports that are selected by the Accused Products (as described above) may be re-ordered (thereby providing functionality corresponding to the structure set forth at 12:18-12:28 of the '497 Patent, the corresponding structure identified by the Court).  This process is generally described in EA0023563-617 ███████████

21



███████████████.  Dr. Kelly admits that there are repeated efforts to connect to a ████ ██████████████████████████████████████  Ex. 9 (Kelly Rpt.) at ¶¶ 104-106; Ex. 43 (Rough Kelly Tr.) at 46:8-48:12.  In doing so, the call-in port is reordered as the ████████████████████████████████████████████████████ ███████████████████████  Ex. 48 at EA0024552 █████████████████  Ex. 30 at EA0032814-15; Ex. 35, EA0033595-97; Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 90-91.

For Xbox devices, if the initial attempts to connect are unsuccessful, the port ordering algorithm reorders the ports by █████████████████████████████████ ████████████████████ and corresponding to the identified structure in the '497 Patent.  Ex. 4 (Mitz. Reply Rpt.) at ¶¶ 80, 91; Ex. 46, Mitz. Tr. at 119:15-120:8, 120:17-122:18; Ex. 47 at MS/SUB ACCELERATIONBAY 000108; *see also* D.I. 394, Ex. 22 to 2/2/18 Andre Decl. ('497 Patent) at 12:18-12:28.  The Court's Supplemental Claim Construction Order expressly confirms that the re-ordering process may involve the random selection of ports.  D.I. 375 at 22 ("The parties also agree that the fourth limitation, 'means for re-ordering the communications ports selected by the port ordering algorithm,' need not necessarily be, but may be, 'deterministic,' 'non-random,' or '*random.*'") (emphasis added)(citation omitted).

Thus, the Accused Products' use of deterministic and random re-ordering of communications ports that are selected by the port ordering algorithm infringes the final claim element of Claim 9.

### G. The Accused Products Use TCP/IP Connections and Infringe Claim 16 (Element 16)

The Accused Products use TCP/IP communication ports as required by Claim 16 of the '497 Patent.  EA's own witnesses confirmed that TCP/IP communication ports are used for both the underlying network and for connecting players to the ████████████████████  For

example, Mr. Clouatre, designated by EA to provide testimony on this functionality, testified that

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ Ex.

37, Clouatre Tr. at 103:3-11.  Mr. Lo, EA's software engineer, testified that TCP is used to

connect players to the ████████████████ *See, e.g.*, Ex. 42, Lo Tr. at 99:11-22; Ex. 31 at

EA0033963 and EA0033965 ████████████████████.  This is also confirmed in EA's

own documents.  Ex. 3 (Mitz Rpt.) at ¶ 138 (citing AB-EA002385-389; AB-EA002390-392;

AB-EA002430-475; AB-EA002483-86; AB-EA002523; AB-EA002611; AB-EA002620-26;

AB-EA002688-95)(Exs. 49-56 attached hereto).  Indeed, EA's own expert conceded that he did

not provide any rebuttal to AB's infringement allegations specific to Claim 16.  Ex. 43 (Rough

Kelly Tr.) at 40:3-16.  Thus, summary judgment of infringement of Claim 16 is warranted.

## III.    Ms. Lawton's Damages Opinions Should be Excluded as Arbitrary,  Unsupported by the Facts of this Case and Unreliable

The Court should exclude Ms. Lawton's rebuttal damages opinion regarding the

reasonable royalty EA owes to AB for EA's infringement because they do not satisfy the

standards of Federal Rule of Evidence 702 and *Daubert*.  Ms. Lawton does not possess the

"scientific, technical, or other specialized knowledge [that] will help the trier of fact to

understand the evidence or to determine a fact in issue," and her opinions are not "based on

sufficient facts or data," and are not "the product of reliable principles and methods . . . applied .

. . to the facts of the case."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

579, 589-90 (1993).

Ms. Lawton repeats in this action many of the same methodological flaws that render her

opinion unreliable and form the basis of AB's motion to exclude her opinions in *Acceleration*

*Bay LLC v. Activision Blizzard Inc.* (16-453-RGA) (D. Del.) ("*Activision*") (16-453, D.I. 439, 448). Ms. Lawton also offers incurably flawed opinions that are new and unique to this case. AB first addresses the aspects of Ms. Lawton's opinions not previously addressed in its *Activision* motion (Sections A and B, below), and then explains why Ms. Lawton's further opinions here are unreliable for reasons similar to those raised in AB's *Activision* motion.

### A.     Ms. Lawton's Opinions Regarding Purported Non-Infringing Alternatives are Legally Flawed and Factually Unsupported

Ms. Lawton's opinion regarding non-infringing alternatives is legally incorrect and should be excluded. Specifically, Ms. Lawton opines that a non-infringing alternative need not be available or feasible at the time of the hypothetical negotiation, but rather is analyzed at the time of the damages period. Ex. 57 (Lawton's EA Deposition ("Lawton II Tr.")) at 78:13-79:6; 81:1-82:14.[6] That assertion is legally wrong. The availability and feasibility of a non-infringing alternatives must be measured at the time of the hypothetical negotiation when the infringement first began. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348, 2011 WL 197869, at *2 (E.D. Tex. Jan. 20, 2011) (subsequent history omitted) ("Whether the accused infringer had acceptable non-infringing alternatives ***available to it at the time of the hypothetical negotiation*** may be probative of a reasonable royalty for the patented technology.") (emphasis added) (citing *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)); *Mars, Inc. v. Coin Acceptors, Inc.,* 527 F.3d 1359, 1373 (Fed. Cir. 2008) (subsequent history omitted) (striking expert report where no evidence of available acceptable non-infringing alternative available at time of hypothetical negotiation); *Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp., LLC*, No. 8:10CV187, 2016 WL 2772122, at *5 (D. Neb. May 11, 2016), *vacated in part on other grounds,* 879 F.3d 1332 (Fed. Cir. 2018) (excluding

---

[6] Although Ms. Lawton did not testify regarding this aspect of her opinion in the *Activision* case, her legally flawed reasoning equally renders her opinion unreliable in both matters.

evidence of non-infringing alternative where no evidence "alternatives would have been available at the time of the hypothetical negotiation at issue").  The result of Ms. Lawton's legally erroneous opinion is that she evaluates non-infringing alternatives as of the start date of damages in this case (i.e., March 2015), which is more than seven years after her purported hypothetical negotiation date.  Such a legally flawed contention renders her opinion unreliable.

In addition, Ms. Lawton offers in this case an opinion regarding three non-infringing alternatives that she did not address in *Activision* and that are entirely unsupported.  Ms. Lawton first opines that a potential non-infringing alternative for claims requiring the broadcasting of data is to broadcast to fewer than all neighbors.  Ex. 58 (Lawton Rpt.) at ¶ 189.  Ms. Lawton testified that her opinion entirely relies on EA's technical expert, Dr. Macedonia.  Ex. 57 (Lawton Tr. II) 69:3-71:15.  However, Dr. Macedonia offers no such opinion in his expert report.  Thus, Ms. Lawton has no independent basis to opine regarding whether broadcasting to fewer than all neighbors constitutes an available and feasible non-infringing alternative, admits she is not offering a technical opinion independent of Dr. Macedonia, and has no idea regarding Dr. Macedonia's analysis of this purported non-infringing alternative.  *Id.* at 71:1-15.  Thus, Ms. Lawton should not be permitted to opine regarding this entirely unsupported alternative.

Ms. Lawton next offers the unsupported opinion that a non-infringing alternative for the '634 Patent is that EA could ████████████████████████████████████ ████████████████ Ex. 58 (Lawton Rpt.) at ¶ 210.  Ms. Lawton concedes that she provides in her report ***absolutely no support*** for this purported alternative.  Ex. 57 (Lawton II Tr.) at 76:7-14. Ms. Lawton claims that she based her opinion on ████████████████████████ ██████ but did not cite such discussions in her expert report and during her deposition had no idea which expert she is relying on.  *Id.* at 78:22-77:9.  Ms. Lawton concedes that she is not

offering an independent technical opinion regarding this non-infringing alternative. ▉▉▉▉



Ex. 58 (Lawton Rpt.) at ¶ 221.  Ms. Lawton, however, was unable to answer even the most basic question of whether this is an independent non-infringing alternative, or part of her earlier analysis.  Ex. 57 (Lawton II Tr.) at 87:9-88:3. Ms. Lawton admits that she cites *no support* in her expert report for this conclusion and has no idea what the prior art disclosed or which products implement this technique.  *Id.* at 88:4-23.

Turning to the non-infringing alternatives Ms. Lawton identified in *Activision* (which are included in AB's *Daubert* motion in that case), Ms. Lawton contends, without any basis, that a networking tool called "Quazal Eterna" was available to EA as a non-infringing alternative.  Ex. 58 (Lawton Rpt.) at ¶¶ 680, 758, 783, 836(c).  Ms. Lawton goes on to make the wholly unsupported claim that "[a]t the time of the hypothetical negotiation, Boeing would have recognized that EA could have implemented the Quazal Eterna product at relatively low cost.  *Id.* Ms. Lawton has no support (technical, economic or otherwise) for this bald claim.  Ms. Lawton concedes that she does not know anything about how Quazal Eterna works, does not know if it is a technically suitable non-infringing alternative for any of the accused products, and that she is

26

not relying on any of EA's technical experts to find that Quazal Eterna is a suitable non-infringing alternative.  Ex. 57 (Lawton II Tr.) at 148:24-151:20.[7]  Ms. Lawton's only basis for her uninformed opinion regarding █████████████████████████████████████



█████████████████████████████████ *Id*. ███████████████████████████████████ says nothing of whether it is a feasible and available non-infringing alternative suitable for EA to use in the Accused Products.

Ms. Lawton also opines without any reliable basis that the Accused Products could be rendered non-infringing by ████████████████████████████████████████████████████████████████████████████████████████████████████████ ███ Ex. 58 (Lawton Rpt.) at ¶ 189; Ex. 57 (Lawton II Tr.) at 73:5-75:7.  Ms. Lawton, however, admits she does not know if Mr. Lo analyzed the Accused Product's source code, what the modifications Mr. Lo described were, or whether the Accused Products would operate in the same manner following the modification of the source code.  *Id.*  Mr. Lo is not a technical expert and EA did not identify him in its initial disclosures or interrogatory responses as someone with knowledge regarding non-infringing alternatives.  Ex. 66 (Initial Discl.) at 4.  Thus, Ms. Lawton's opinion is unsupported.

Ms. Lawton should be precluded under Federal Rule of Evidence 702 and *Daubert* from offering her unsupported opinions regarding purported non-infringing alternatives that are not addressed by EA's technical experts, were not disclosed during discovery, and for which there is no evidence that they even were available to EA at the time of the hypothetical negotiation.  Ex.

---

[7] Tellingly, EA did not identify Quazal Eterna in response to Acceleration Bay's interrogatory asking for disclosure of all non-infringing alternatives EA contends are available.  Ex. 59 (Interrog. Resp. No. 2).

59 (EA's Resp. Interrog. No. 2); Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 589-90.  Ms.

Lawton agrees that an expert must provide evidence that an alleged non-infringing alternative is

technologically feasible and available in order for it to be relevant for damages purposes.  Ex. 57

(Lawton II Tr.) at 66:22-67:1; Ex. 60 (Lawton ATVI Deposition ("Lawton I Tr.")) at 182:15-

183:13; *LaserDynamics*, 2011 WL 197869, at *3 (citing *Grain Processing Corp. v. Am. Maize-

Prods. Co.*, 185 F.3d 1341, 1353-54 (Fed. Cir. 1999)).  Ms. Lawton also freely admits that she is

not offering, nor is she qualified to offer, a technical opinion regarding the suitability of a non-

infringing alternative.  Ex. 57 (Lawton II Tr.) at 9:9-10:11; Ex. 60 (Lawton I Tr.) at 23:24-25:11.

The Court should not allow her to do so under the guise of an economic analysis.  *See Elcock v.

Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35

F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 589)).  Ultimately, Ms. Lawton

should be precluded from presenting these opinions regarding the availability of suitable non-

infringing alternatives when she has no technical basis for such a statement.  *Brandeis Univ. v.

Keebler Co.*, No. 1:12-cv-1508, 2013 WL 5911233, at *7 (N.D. Ill. Jan. 18, 2013).

### B. Ms. Lawton's Opinion that the *Uniloc* Verdict is Not Comparable to the Hypothetical License is Unreasonable

Ms. Lawton's opinion is unreliable and should be excluded because she disregards a jury

award from a prior litigation in which the jury found EA infringed a comparable patent through

the sale of the same franchises at issue here, ignoring the most relevant evidence of a reasonable

royalty for EA's infringement.

There is no established royalty rate for the Asserted Patents.  As a result, AB's damages

expert, Dr. Christine Meyer, utilized a royalty rate of 20 cents per unit derived from a jury's

damages award for a comparable patent from *Uniloc USA, Inc. v. EA*, No. 6:13-cv-00259-RWS

(E.D. Tex.) (Dec. 5, 2014) ("*Uniloc*").  Ex. 61 (*Uniloc* Verdict Form).  In *Uniloc*, the jury found

EA's technology, used with the same game franchises at issue in this case, infringed a Uniloc patent, U.S. Patent No. 5,490,216 ("the Uniloc Patent") and awarded roughly $4.9 million in reasonable royalty damages. Ex. 7 (Meyer Rpt.) at ¶ 133. The *Uniloc* jury based its damages on an 11.5 and 20 cents per unit royalty rate applied against the total sales of the games found to infringe the Uniloc Patent. *Id.* Following the jury verdict, EA entered a settlement agreement with Uniloc, but that settlement agreement was not produced in this action. Another AB expert, Dr. Harry Bims, performed a comprehensive analysis of the similarities and differences between the Uniloc Patent and EA's infringing technology to determine that the patented technology at issue in Uniloc is comparable to the technology at issue here, but the technical value to EA from its infringement of the Asserted Patents is significantly greater than the benefit to the defendant in the *Uniloc* case derived from use of the Uniloc Patent. Ex. 5 (Bims Rpt.) at ¶¶ 79-87.

Importantly, Ms. Lawton agrees that litigation verdicts may be a reliable basis to determine a reasonable royalty. Ex. 60 (Lawton I Tr.) at 20:10-21:1. However, she disregards the Uniloc/EA Verdict as not comparable even though it involved EA as defendant in a patent infringement suit involving the same game franchises at issue here and a patent in the same technological field as the Asserted Patents. Ms. Lawton testified that her opinion would not change, even if the Uniloc/EA verdict covered the same products accused of infringement here. Ex. 57 (Lawton II Tr.) at 119:9-120:7. ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████ Instead, she merely ignored these factors because they undermine her opinion. Such an arbitrary rejection of a comparable verdict renders her opinion unreliable.

**C.      Ms. Lawton's Reasonable Royalty Opinion Rests on Speculation**

Ms. Lawton's opinion is unreliable because it is based on arbitrary calculations and speculation as opposed to reliable facts, specialized knowledge, or methodology.  Ms. Lawton agrees with AB's expert that, at the hypothetical negotiation, the patentee and the accused infringer must consider a reasonable royalty resulting from the accused infringer's infringement. Ex. 58 (Lawton Rpt.) at ¶ 745.  But her opinion ignores EA's infringement.

Ms. Lawton's opinion follows the same flawed methodology as the opinion she set forth in the *Activision* case.  Specifically, the basis of her opinion is a ████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
██

Ms. Lawton's analysis should be excluded as unreliable because, as explained below, each of the steps in her computation of a reasonable royalty is premised on her subjective and speculative reductions of the license fee and assumptions regarding the ██████████████ which are untied to the facts of this case.  Indeed, her mathematical inputs are akin to the 25%

rule of thumb, which the Federal Circuit has found to be inadmissible "because it fails to tie a reasonable royalty base to the facts of the case at issue." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331–34 (Fed. Cir. 2014), quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011); *see also Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, No. 12-540-LPS, 2015 WL 1303643, at *4 (D. Del. Mar. 20, 2015) (excluding as an unreliable rule of thumb opinion regarding "relative value allocation" that was based on general research and not tied to the facts of the case).

*First*, after assuming that the ▮▮▮▮▮▮▮▮▮ is comparable to the license that AB and EA would have reached as a result of the hypothetical negotiation, Ms. Lawton takes the



She has no basis in fact for her arbitrary mathematical calculation of the 50%

---

[8] Ms. Lawton confirmed during her deposition that there is no difference between how she arrived at her opinion regarding the 50% Sublicense Reduction in this case and in the *Activision* case.  Ex. 57 (Lawton II Tr.) at 137:20-138:9.

Sublicense Reduction.  Thus, Ms. Lawton should be precluded from providing her damages

opinion, which relies upon it, for the same reasons the Federal Circuit rejected the 25% rule of

thumb, namely, that is arbitrary and not tied to the specific facts of the litigation.  *Bowling v.*

*Hasbro, Inc.*, C.A. No. 05-229S, 2008 WL 717741, at *6 (D.R.I. Mar. 17, 2008) (precluding

opinion where mathematical calculation failed to consider relationship between the parties).

*Second*, ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

---

[9] Ms. Lawton confirmed during her deposition that there is no difference between how she
arrived at her opinion regarding the ███████████████ in this case and in the *Activision* case.
Ex. 57 (Lawton II Tr.) at 139:7-12.

*Third*, Ms. Lawton then divides her unfounded ██████████ by thirteen, arbitrarily assuming that there are thirteen games that would have been licensed under the ██████ ██████ (the "13 Game Assumption"), to come up with a ██████ per-game reasonable royalty. *Id.* at ¶ 777; Ex. 57 (Lawton II Tr.) at 141:7-9.[10]  This makes her calculation even more unreliable.  Ms. Lawton admitted that ***seven*** of the thirteen licensed games belong to non-parties (i.e., Activision Blizzard and Take Two) that would ***not*** be part of the hypothetical negotiation here.  *Id*; *see also* Ex. 57 (Lawton II Tr.) at 141:16-142:2; 144:14-145:4.  Ms. Lawton uses these unidentified non-party games to support this ratio, which has no basis in law or fact to the hypothetical negation, where EA would only have been negotiating for six infringing game titles. *Id.*  As a result, applying to the hypothetical license a ratio that includes the unaccused games of non-parties is entirely arbitrary and unreliable.  There is no factual support in this case, from the ████████████████ itself, or the depositions of individuals knowledgeable regarding its execution, that the parties to the ████████████████████████████ ████████████████████████████████████  And Ms. Lawton never explains why non-party games would impact the parties' hypothetical negotiation for EA's games accused of infringement here.  Ms. Lawton then misapplies this baseless ██████ per game reasonable royalty to the six game titles accused of infringement here for a total of ██████.  This figure provides the low-end of Ms. Lawton's reasonable royalty range.  Ex. 58 (Lawton Rpt.) at ¶¶ 777-778.

*Fourth*, Ms. Lawton further arbitrarily opines that ██████ is the high-end of the reasonable royalty range.  *Id.* at ¶¶ 776-78; Ex. 57 (Lawton II Tr.) at 145:6-10.  Ms. Lawton



---

[10] Ms. Lawton confirmed during her deposition that there is no difference between how she arrived at her opinion regarding the 13 Game Assumption in this case and in the *Activision* case. Ex. 57 (Lawton II Tr.) at 141:7-15.

again starts with the ██████████████████████████████. Ex. 58 (Lawton

Rpt.) at ¶ 776.  This time, however, Ms. Lawton reduces this figure by 75%.  *Id.* ████████



Ms. Lawton's *ipse dixit* opinion regarding a reasonable royalty should be rejected as

unreliable.  Without any indication of how the parties calculated the lump sum of the

██████████████████████████████████████████████

██████ her opinion is "little more than a recitation of royalty numbers."  *Wordtech Sys., Inc. v.*

*Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (finding lack of data

insufficient to support jury verdict).  "[A]n expert opinion is not admissible when it is connected

to existing data only by the *ipse dixit* of an expert."  *Bowling*, 2008 WL 717741 at *4, 7 ("expert

is a conduit of facts and not merely a subjective speculator relying on stature alone") (citations

omitted).  A court is not required to "take the expert's word for it."  *Id.* at *7.  Rather, the Court

serves "as a gatekeeper in order to ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation."  *Id.*

Here, Ms. Lawton's opinion that the parties would have agreed to a reasonable royalty in the range of between ████ and ████ is unreliable and completely untethered to the specific facts of this case.  Ms. Lawton's subjective belief and speculation do not justify the math she performs utilizing the ████████ and, as a result, her opinions should be excluded. *Id.* at *7 (expert opinion testimony "must be shown to be based on more than the subjective belief or unsupported speculation of the expert.") (citation omitted).

### D.   Ms. Lawton Assumes Comparability of the ████████ Without Any Analysis

Ms. Lawton's reasonable royalty opinion should be excluded because she failed to account for the technological and economic differences between the ████████ and the hypothetical license.  *See M2M Sols. LLC v. Motorola Sols., Inc.*, No. CV 12-33-RGA, 2016 WL 767900, at *8 (D. Del. Feb. 25, 2016) (excluding expert opinion that failed to consider the economic differences between negotiations of prior licenses and the hypothetical negotiation) citing *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F.Supp.2d 999, 1022 (S.D. Cal. 2011) ("The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded."); *see also Sprint Commc'ns Co. v. Comcast IP Holdings, LLC*, No. 12-1013-RGA, 2015 WL 456154, at *1–3 (D. Del. Jan. 30, 2015) (excluding expert testimony based on prior license agreements because it was not "sufficiently comparable to the hypothetical licenses").[11]

---

[11] *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675 (D. Del. 2016) (excluding expert opinion that invited the court to "blindly accept the unsubstantiated conclusions of its experts"); *LaserDynamics*, 694 F.3d at 79 ("When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *Dataquill*, 887 F. Supp. 2d at 1024 (finding expert failed to present sufficient evidence

The first and second *Georgia-Pacific* factors consider "royalties received by the patentee for licensing the patents in suit" and "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." *Georgia–Pacific*, 318 F. Supp. at 1120.  These factors "examine whether the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).  "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." *Uniloc*, 632 F.3d at 1317.  A party cannot rely on license agreements that are "radically different from the hypothetical agreement under consideration." *Id.* at 1316, quoting *Lucent*, 580 F.3d at 1327.  Rather, "comparisons of past patent licenses to the infringement must account for the 'technological and economic differences' between them." *Wordtech Sys.*, 609 F.3d at 1320 (citation omitted).

Ms. Lawton recognizes that the ███████████ "for valuation purposes in a hypothetical negotiation needs to be both technically and economically comparable" to the hypothetical license in this case.  Ex. 60 (Lawton I Tr.) at 7:22-8:4.  But she does not address the differences between the two licenses.

Rather, Ms. Lawton contends that no analysis of technical comparability is necessary if a license covers the same patent that is the subject of the hypothetical negotiation.  Ex. 57 (Lawton II Tr.) at 176:20-177:2; Ex. 60 (Lawton I Tr.) at 8:5-20.  She is wrong.  Comparability of license agreements is a stringent standard that cannot be assumed simply because a license agreement involves some of the same patents. *Wordtech*, 609 F.3d at 1319 (applying technologic and economic comparability standard to determine the sufficiency of a party's analysis of prior

---

regarding comparability of license); *NetAirus Techs., LLC v. Apple, Inc.*, No. LA CV 10-03257 JAK(Ex), 2013 WL 11237200, at *8 (C.D. Cal. Oct. 23, 2013) (granting motion to exclude expert damages opinions where expert did not demonstrate the comparability).

licenses to the patents-in-suit under *Georgia-Pacific* Factor 1); D.I. 442 (16-cv-453), AB Br. at 38-43 (collecting cases).  A license to the same patents does not render it per se comparable.  Ms. Lawton's failure to do any analysis regarding the technology at issue renders her conclusion of comparability improper.

Ms. Lawton concedes that she is not a technical expert and admits that she did not perform a technical comparison between (1) ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████ █ ████████████████████████████████████████ ████████████████████████████████

Moreover, Ms. Lawton's comparability analysis of the ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████

---

[12] Ms. Lawton confirmed during her deposition that her view regarding the comparability of the ████████████████ in this case is consistent with the opinion she offered in the *Activision* case. Ex. 57 (Lawton II Tr.) at 136:14-20.

The hypothetical negotiation should be premised on the assumption that EA is infringing the Asserted Patents, ███████████████████████████████████████████████████ ████████████ Ms. Lawton entirely fails to address this key undisputed fact, i.e., that the ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████

Moreover, Ms. Lawton fails to account for the fact that, in less than a two-year period starting from the filing of the predecessor suit to this action, ████████████████████████ ███████████████████████████████████ a fact that Ms. Lawton agrees is relevant to the hypothetical negotiation. Specifically, Ms. Lawton agrees that under the book of wisdom doctrine, the parties to the hypothetical negotiation would be fully aware of EA's use of the infringing technology and its substantial profits from the sales of the infringing products. Ex. 60 (Lawton I Tr.) at 108:7-109:18; Ex. 57 (Lawton II Tr.) at 113:20-114:18. *Lucent*, 580 F.3d at 1333 (the book of wisdom provides that "factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation.'"). The ████████████████████ is thus an entirely non-comparable starting point for the hypothetical negotiation.

By ignoring EA's position in the market as compared to Sony's, including the substantial profits EA obtained from selling the accused products, Ms. Lawton fails to account for the circumstances of this case and violated the fundamental purpose of the book of wisdom doctrine: to "ensure the recovery of 'damages adequate to compensate for the infringement,'" "prevent[] the hypothetical negotiation method from determining a reasonable royalty at a point in time before the patent has proven its worth," and prevent prospective infringers from perceiving that "'blatant, blind appropriation of inventions . . . is the profitable, can't-lose course.'" *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 464-65 (D. Del. 2005) (quoting *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988)). Such a blind disregard of key economic facts leads to Ms. Lawton's outrageous contention that the parties to the hypothetical negotiation would have reached the exact same outcome (i.e., a reasonable royalty between ███████████ even if they knew EA would have only one dollar in infringing sales or $500 million in infringing sales. Ex. 57 (Lawton II Tr.) at 117:3-12; Ex. 60 (Lawton I Tr.) at 190:17-191:16. Ms. Lawton's claim that revenues do not matter is absurd and violates the fundamental principle that a license must be economically comparable. *Wordtech Sys.*, 609 F.3d at 1320.

Ms. Lawton also failed to account for numerous other undisputed factual differences between the ████████████████████████████

█████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████



These undisputed factual differences further confirm that Ms. Lawton's opinion based on

███████████████ is unreliable and should be excluded.

### E.   Ms. Lawton's Opinion as to the Date For the Hypothetical Negotiation is Unsupported and Arbitrary

Ms. Lawton's damages opinion is also unreliable because her selection of the date for the

hypothetical negotiation is unsupported.  Ms. Lawton contends that the hypothetical negotiation

should take place on August/September 2007.  Ex. 58 (Lawton Rpt.) at ¶¶ 754-56.  She bases the

August/September 2007 date on the pre-order, order and shipment dates associated with FIFA 08

and NHL 08—which are not accused of infringement here. (*see id.,* at ¶ 755).  Ms. Lawton

further incorrectly testified during her deposition that a single hypothetical negotiation date is

appropriate for all of the Accused Products, including the PvZ products, even if there is no

evidence that these products were developed or released until several years after her proposed

hypothetical negotiation date.  Ex. 57 (Lawton II Tr.) at 93:16-94:8).  Ms. Lawton's hypothetical

negotiation date is wrong as a matter of law.

The date of the hypothetical negotiation is the "start of the activity actually accused of

infringement."  *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2015 WL

1265009, at *3 (N.D. Cal. Mar. 19, 2015).  Thus, the hypothetical negotiation date must be tied

to the start of infringement *by the products actually accused of infringement*, "not just before the start of infringement by any [] product that incorporates allegedly infringing features." *Id.*; *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361–62 (Fed. Cir. 2006) (hypothetical negotiation must be for accused products, not earlier products).

Here, AB accused of infringement FIFA 15 and16 (released September 23, 2014 and September 22, 2015, respectively), NHL 15 and 16 (released September 9, 2014 and September 15, 2015, respectively),  PvZ:Garden Warfare and PvZ: Garden Warfare 2 (released February 25, 2014 and February 23, 2016, respectively).  Ex. 7 (Meyer Rpt.) ¶¶ 21(a) and (b), 22(a) and (b); 23(a) and (b).  Thus, Ms. Lawton's proposed hypothetical negotiation date is incorrect because it is tied to products released 7-10 years before the release of the Accused Products.  *Fujifilm*, 2015 WL 1265009, at *3; *Applied Med. Res.*, 435 F.3d at 1361–62.

Moreover, there is nothing to establish that earlier versions of FIFA 08 or NHL 08 contain the same functionality accused of infringement by EA.  Ms. Lawton did not review source code for FIFA 08 or NHL 08 and offers no technical opinion as to when the infringing technology was added to FIFA or NHL.  Ex. 57 (Lawton II Tr.) at 21:14-16; 22:7-15; 23:11-15; 25:4-20; 29:6-12.  That fact, alone, is not surprising.  However, what is surprising is that EA's technical experts never offered any opinions on this issue or even investigated the predecessors to the games at issue in this case.  *See, e.g.,* Ex. 9 (Kelly Rpt.) at ¶ 3.  Ms. Lawton relies on EA's interrogatory response and a conversation with an EA employee, Mike Smith.  Ex. 57 (Lawton II Tr.) at 22:7-15.  Mr. Smith, however, is not qualified to determine when FIFA or NHL began to infringe.  First, EA only identified Mr. Smith as having knowledge about the operation of NHL 15 and NHL 16.  Ex. 66 (8/2/17 Initial Discl.) at 4.  Thus, he was not designated to testify on FIFA.  Ex. 36 (Smith Tr.) at *e.g.*, 11:3-7.  ████████████████████

████████████████████████████████████████████████

Moreover, Ms. Lawton was unaware of what, if any, investigation Mr. Smith performed to support his statement regarding when the accused functionality was implemented into FIFA 08 and NHL 08.  For example, Ms. Lawton could not confirm whether Mr. Smith examined any source code of FIFA 08 or NHL 08 (Ex. 57 (Lawton II Tr.) at 21:11-13, 29:13-20, 37:10-22), whether he performed any analysis whatsoever of FIFA 08 (*id.* at 20:21-25) and never inquired when certain accused functionalities, such as voiceover IP and squelching, were added to the Accused Products (*id.* at 29:21-30:7).

Thus, there is no basis for Ms. Lawton's proposed hypothetical negotiation date and her opinion should be precluded as unreliable and unsupported.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant Acceleration Bay's motions for summary judgment and to exclude the proposed opinions of Ms. Lawton.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ Philip A. Rovner*

Paul J. Andre
Lisa Kobialka
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

    Philip A. Rovner (# 3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    provner@potteranderson.com
    jchoa@potteranderson.com

Aaron M. Frankel
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Attorneys for Plaintiff*
*Acceleration Bay LLC*

March 23, 2018
Public version dated: April 4, 2018
5707519