IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACCELERATION BAY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-454 (RGA) |
| | ) | |
| ELECTRONIC ARTS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT OF
<u>NON-INFRINGEMENT BY COLLATERAL ESTOPPEL</u>**

OF COUNSEL:

David P. Enzminger
Michael A. Tomasulo
Gino Cheng
Joe S. Netikosol
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
(213) 615-1700

Louis L. Campbell
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
(650) 858-6500

Daniel K. Webb
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant*

Joseph C. Masullo
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000

November 22, 2021

# TABLE OF CONTENTS

I.    Nature and Stage of the Proceedings .................................................................... ii

II.   Summary of the Argument ................................................................................... 2

III.  Statement of the Facts ........................................................................................ 3

     A.   The Asserted Patents .................................................................................. 3

     B.   Prior Summary Judgment Orders Disposed of Most of the Claims ............................. 3

     C.   *Take-Two* Held That Acceleration Was Unable to Show Infringement of the "m-regular" Claim Limitation .............................................................. 4

     D.   Acceleration Did Not Appeal the m-regular Non-infringement Holding and Lost Every Issue It Did Raise in Its *Take-Two* Federal Circuit Appeal ................ 4

IV.  Legal Standards ................................................................................................. 5

V.   Acceleration is Collaterally Estopped From Asserting that the Accused EA Video Games Infringe ....................................................................................... 7

     A.   The Issues Here Are the Same as in *Take-Two* Because Acceleration's Theories of Infringement Are the Same in Both Cases ................................. 7

         1.   The Operation of EA's Accused Games ............................................. 7

         2.   Acceleration is Estopped From Asserting Infringement Where The Accused Network Includes a Server That Is Connected to the Player Participants and That Is Also a Participant ............................................ 8

         3.   Acceleration is Estopped From Asserting Infringement Where The Connections Are Influenced By Player Decisions or Are Alleged to "Converge" to an m-regular Network. ............................................ 13

         4.   Acceleration's m-regular Doctrine of Equivalents Theory Is Barred ................ 17

     B.   The Remaining Elements of Collateral Estoppel Are Met ......................................... 18

VI.  Even Absent a Collateral Estoppel Holding, this Court Should Grant Summary Judgment of No Infringement ............................................................................. 19

VII. The Court Already Granted Summary Judgment on Acceleration's '497 Patent Allegations ........................................................................................................ 19

VIII. Conclusion ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. 2K Sports, Inc.*,
   15 F.4th 1069 (Fed. Cir. 2021) ...............................................................................1, 4, 5, 18

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
   324 F.Supp.3d 470 (D. Del. 2018)...........................................................................................1

*Acceleration Bay LLC v. Electronic Arts Inc.*,
   No. 16-454-RGA, 2019 WL 1376036 (D. Del. Mar. 27, 2019) ................................1, 8, 19, 20

*Acceleration Bay LLC v. Take-Two Interactive Software*,
   C.A. No. 16-455-RGA, 2020 WL 1333131 (D. Del. Mar. 23, 2020)............................ *passim*

*Acumed LLC v. Stryker Corp.*,
   525 F.3d 1319 (Fed. Cir. 2008).................................................................................................6

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*,
   908 F.3d 1267 (Fed. Cir. 2018).............................................................................................5, 6

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*,
   713 F.3d 1377 (Fed. Cir. 2013)...........................................................................................5, 6, 7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)................................................................................................................17

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
   937 F.3d 1359 (Fed. Cir. 2019).................................................................................................5

*Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*,
   458 F.3d 244 (3d Cir. 2006).................................................................................................5, 18

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
   617 F.3d 1296 (Fed. Cir. 2010)......................................................................................6, 12, 13

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997)..................................................................................................................17

## I.     Nature and Stage of the Proceedings

Acceleration Bay originally asserted that EA, Take-Two, and Activision infringed claims from six patents (the '344, '966, '634, '147, '069, and '497 patents). D.I. 1; 455 D.I. 1; 453 D.I. 1.[1] Prior summary judgment rulings have left only the allegations that all accused games infringe '147 patent claim 1 and that the accused NHL and Plants vs. Zombies ("PvZ") games infringe the asserted claims of the '344 and '966 patents to the extent EA tests those games internally in the United States. *See Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F.Supp.3d 470, 478-79, 485-87 (D. Del. 2018) ("*Activision*") (holding certain claims invalid); *Acceleration Bay LLC v. Electronic Arts Inc.*, No. 16-454-RGA, 2019 WL 1376036 (D. Del. Mar. 27, 2019) ("*EA*") (address claims not found invalid in *Activision*). After those decisions, the Court granted Take-Two's motion for summary judgment of non-infringement of all asserted patent claims. *Acceleration Bay LLC v. Take-Two Interactive Software, Inc.*, No. 16-455-RGA, 2020 WL 1333131 (D. Del. Mar. 23, 2020) ("*Take-Two*"). Shortly thereafter, the Court *sua sponte* stayed this case pending the resolution of the appeal of *Take-Two*, noting that "the resolution of that appeal will likely simplify the remaining issues in this case and likely indicate whether any of my prior decisions need to be revisited." D.I. 561 (4/21/20 order). The Federal Circuit has now affirmed *Take-Two*. *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069 (Fed. Cir. 2021) ("*Acceleration Bay*"). In the wake of that affirmance, the Court granted EA's request for leave to file the present motion. D.I. 579 (11/4/21 hearing tr.) at 31:15-20.

---

[1] "453 D.I." refers to the docket of *Acceleration Bay LLC v. Activision Blizzard, Inc.*, C.A. No. 16-453-RGA and "455 D.I." refers to the docket of *Acceleration Bay LLC v. Take-Two Interactive Software*, C.A. No. 16-455-RGA.

## II.     Summary of the Argument

The only remaining patents in this case are the '344, '966, and '147 patents, each of which explicitly require that the accused network or broadcast channel be "m-regular." Acceleration's infringement arguments for the "m-regular" limitation are the same as those it fully litigated and lost in *Take-Two*. Acceleration chose not to appeal those key rulings. Those rulings have full collateral estoppel (or "issue preclusion") effect in this case.

The Court has construed each asserted claim in this case to require the accused videogame networks to be configured to maintain m-regularity, meaning the default structure of the network is that every "participant" in the network must connect to exactly the same number of participants. As in *Take-Two*, Acceleration's infringement theories for EA's networks here, even if taken as true, cannot satisfy this Court's claim constructions.

In *Take-Two*, Acceleration fully litigated three issues that, if given proper collateral estoppel effect here, establish non-infringement across all remaining claims.

**First Issue:** Where an incomplete network for an accused game includes a server that "transfers data back and forth between other network participants," the network is not m-regular because the server participant will necessarily have more connections than the other participants. *Take-Two* at \*9. Here, as in *Take-Two*, Acceleration's experts acknowledge that the accused networks include a server participant that is connected to and transfers data back and forth between every player participant. This makes m-regularity, and thus infringement, impossible, as the Court recognized in *Take-Two*. Collateral estoppel bars re-litigation of this issue.

**Second Issue:** A network is not "configured to maintain" m-regular connections where the network's connections are determined by player decisions or where "rules and constraints … cause the gameplay network to converge to the same number of connections for each participant." *Take-Two* at \*7-8. Here, as in *Take-Two*, Acceleration has argued that the EA games were m-regular as

a result of player decisions (e.g., choosing to talk), because they are "configured to converge to the same number of connections," and because they "apply logics rules in the selective distribution of gameplay data." D.I. 467 (Acceleration MSJ opposition brief) at 3-4. Acceleration fully litigated this issue in *Take-Two*, with the Court ruling that such networks do not infringe. *Take-Two* at *8. Collateral estoppel bars re-litigation of this issue.

**Third Issue:** Infringement of the "m-regular" limitation under the doctrine of equivalents for the '344, '966, or '147 patents "is barred by prosecution history estoppel" because the limitation was added during prosecution to overcome prior art. *Take-Two* at *9. In addition, the Court also rejected the equivalents infringement theory because it would vitiate the claim limitation by "reading the m-regular limitation out of the patent." *Id.* at *8-9. Acceleration fully litigated this issue in *Take-Two*, with the Court ruling that Acceleration's doctrine of equivalents theories were improper. *Id. Id.* at *8. Collateral estoppel bars re-litigation of this issue.

## III.   Statement of the Facts

### A.   The Asserted Patents

The Asserted Patents describe a computer network and broadcast channel with an m-regular, incomplete topology. The m-regular networks in the Asserted Patents differ from prior art client-server networks, which the Asserted Patents denigrate as "not particularly well suited to sharing of information among many participants," and causing "a performance bottleneck." *See, e.g.*, D.I. 1, Ex. 1 ('344 patent) at 1:58-2:14.

### B.   Prior Summary Judgment Orders Disposed of Most of the Claims

Following the summary judgment rulings in *Activision* and in this case, the only infringement allegations against EA that escaped summary judgment were: 1) EA allegedly infringes claims 12, 13, and 14 of the '344 patent and claims 12 and 13 of the '966 patent when it internally tests the NHL and PvZ games and 2) EA allegedly infringes claim 1 the '147 patent

under the doctrine of equivalents for all three accused games. The asserted claims of these three patents each explicitly recite the m-regular limitation. *Take-Two* at *7.

### C. *Take-Two* Held That Acceleration Was Unable to Show Infringement of the "m-regular" Claim Limitation

In the Take-Two summary judgment decision, the Court disposed of all the claims against Take-Two with three rulings. *First*, the Court reiterated that making and selling video games cannot be making or selling the asserted '344, '966, and '497 patent claims. *Take-Two* at *4-5. *Second*, the Court held that Acceleration presented insufficient evidence that Take-Two tested the accused games in the accused modes and therefore Take-Two could not be found to "use" the claims of the '344, '966, and '497 patents either. *Id.* at *5-7. *Third*—and most importantly for the purposes of this motion—the Court held that Take-Two did not infringe the asserted '344, '966, '069, and '147 patent claims either literally or under the doctrine of equivalents because the accused games did not infringe the "m-regular" claim limitations. *Id.* at *7-10.

### D. Acceleration Did Not Appeal the m-regular Non-infringement Holding and Lost Every Issue It Did Raise in Its *Take-Two* Federal Circuit Appeal

Acceleration appealed only two rulings to the Federal Circuit: 1) the holding that Take-Two did not infringe the '344, '966, and '497 patents by making, selling, or offering to sell and 2) the Court's construction that the '069 claims contain an "m-regular" limitation. *Acceleration Bay*, 15 F.4th at 1075-78. Acceleration did not appeal this Court's judgment that the accused Take-Two products did not utilize an m-regular network because a client-server network cannot be m-regular and because unsupported "rules and constraints" resulting from player action did not describe a network that was designed to maintain an m-regular structure. *Id.* The Federal Circuit first held that the appeal as to the '344 and '966 patents was moot because Acceleration did not challenge the m-regular holding, which was an independent ground for non-infringement of those patents. *Id.* at 1076-77. The Federal Circuit next found the challenge to construction of the '069 patent was

moot because Acceleration challenged only one of the two separate constructions construing the '069 claims to require an "m-regular" network. *Id.* at 1077. And, finally, on the merits, the Federal Circuit upheld this Court's holding that making and selling video game software does not make or sell the hardware component of the asserted '497 patent claims. *Id.* at 1077-78.

## IV.    Legal Standards

"Collateral estoppel precludes a plaintiff from relitigating identical issues by merely switching adversaries and precludes a plaintiff from asserting a claim that the plaintiff had previously litigated and lost against another defendant." *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013). Collateral estoppel is not unique to patent law, so the Federal Circuit will apply the precedent of the regional circuit. *Id.* "Under Third Circuit law, collateral estoppel applies when (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1273 (Fed. Cir. 2018). To determine whether an issue was "essential to the prior judgment," the Federal Circuit again turns to the law of the regional circuit. *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 937 F.3d 1359, 1370-71 (Fed. Cir. 2019). In the Third Circuit, the "essential to the prior judgment" element is satisfied where the prior judgment was reached through alternative findings. *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 255 (3d Cir. 2006) ("we will follow the traditional view that independently sufficient alternative findings should be given preclusive effect.").

Rather than formally applying a multi-element test, the Federal Circuit often shortcuts the collateral estoppel inquiry by looking to whether the patentee had "had a full and fair opportunity to litigate [the] issue." *Aspex Eyewear*, 713 F.3d at 1382. In practical effect, collateral estoppel applies to non-infringement holdings "where it is shown that a close identity exists between the

relevant features of the accused device and the device previously determined to be non-infringing such that they are essentially the same." *ArcelorMittal*, 908 F.3d at 1274. "Accused devices are essentially the same where the differences between them are merely colorable or unrelated to the limitations in the claim of the patent." *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008).

For example, in *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296 (Fed. Cir. 2010), Transocean had previously sued GSF for infringement of an oil drilling rig patent. Transocean prevailed in the GSF suit and the district court issued an injunction that required GSF to employ a "casing sleeve" on its rig, because a rig with a casing sleeve would not infringe. *Id.* at 1307. But in Transocean's next suit, against Maersk, for infringing the same patent claims, Maersk, who had monitored the case against GSF, had already employed a "casing sleeve" on its rig. *Id.* at 1307. The Federal Circuit found "that the infringement issue in [ Maersk] is identical to the one in GSF" because the prior decision had already "determined that the modified rig [*i.e.*, a rig with a casing sleeve] did not infringe." *Id.* at 1312. The feature that made the accused products "essentially the same" in both cases was the casing sleeve because it was the presence of that casing sleeve in the first case that made the rig non-infringing. Thus, because Maersk used a similar casing sleeve in its rig, Transocean was collaterally estopped from arguing that Maersk's rig infringed. *Id.* at 1312.

Likewise, in *Aspex Eyewear*, the patents involved clip-on sunglass lenses that attach by magnet to ordinary sunglasses. *Aspex*, 713 F.3d at 1378-79. In the first suit, the district court determined that the patent required rims around the lenses, and that Altair did not infringe because its magnetic clip-on sunglasses were rimless. *Id.* at 1380. Zenni, the defendant in the second suit, argued that Aspex's infringement allegation was collaterally estopped because its "accused rimless

magnetic clip-on sunglasses are materially indistinguishable from Altair's rimless magnetic clip-on sunglasses." *Id*. The Federal Circuit agreed, noting that collateral estoppel "precludes a plaintiff from relitigating identical issues by merely switching adversaries." *Id*. The feature that made the accused products "essentially the same" in both cases was that they lacked rims around the lenses because it was the absence of those rims that led to the finding of noninfringement in the first case. Thus, because Aspex had a full and fair opportunity to litigate whether its patent required a rim around the lens, it was collaterally estopped from arguing that Zenni's rimless glasses infringed. *Id.* at 1382.

## V.   Acceleration is Collaterally Estopped From Asserting that the Accused EA Video Games Infringe

### A.   The Issues Here Are the Same as in *Take-Two* Because Acceleration's Theories of Infringement Are the Same in Both Cases

The issue whether the accused products infringe the m-regular limitation is the same here as in *Take-Two*. In all material respects, the networks used by the accused EA games are the same as the client-server networks used by the accused games in *Take-Two*. But even more importantly, Acceleration's *theories of infringement* are the same in both cases, with Acceleration proposing an "application overlay network" that ignored the presence of the central server and suggesting possible infringement that may or may not occur based on the actions of the players in the game. In other words, the features of the accused games which Acceleration alleges make them infringing are the same in both cases. Thus, the issues in both cases are the same and collateral estoppel of non-infringement is appropriate.

#### 1.   The Operation of EA's Accused Games

EA's prior summary judgment briefs described the operation of the client-server networks used by the accused games in detail. *See* D.I. 426 (EA MSJ brief) at 4-11. In its summary judgment opposition, Acceleration did not dispute *any part* of EA's description of the networks used by the

accused video games. D.I. 467 (Acceleration MSJ opposition brief) at 2-6. Instead, Acceleration asserted that there is an m-regular application layer overlay network overlaid on the networks described in EA's briefs. *Id.* at 2 ("It is this application layer network, which overlays the underlying network in each of the Accused Products, that is configured to be m-regular and incomplete") (emphasis omitted). The Court held that the dispute over which layer to evaluate was a "factual question" precluding summary judgment, but the Court did not consider whether the alleged application layer overlay network would satisfy the claim limitations. *EA* at *7. The Court did, however, reach that issue in *Take-Two*, as described below.

For purposes of this motion—just as Take-Two did on its motion for summary judgment—EA will analyze *only* Acceleration's alleged application layer overlay network. *See* 455 D.I. 463 (Take-Two MSJ brief) at 9-10 ("Although Defendants believe that that the so-called 'overlay' network alleged by Acceleration is almost completely wrong, for this motion Defendants will accept Plaintiff's characterization"). As in Take-Two, this Motion does not rely at all on EA's experts. Acceleration alleges the same "application layer overlay network" is used for all three of EA's accused games. *See* D.I. 467 (Acceleration MSJ opposition brief) at 2-6; *see also, e.g.,* D.I. 428, Ex. A-1 (Medvidović opening report) at ¶¶ 189-228. Because of this, the discussion below is the same for all three accused games. The issue is whether Acceleration's allegations show an m-regular and incomplete network. They do not. Acceleration's arguments here are the same as the arguments that Acceleration raised, lost, and did not appeal in *Take-Two*.

### 2. Acceleration is Estopped From Asserting Infringement Where the Accused Network Includes a Server That Is Connected to the Player Participants and That Is Also a Participant

Acceleration is estopped from alleging that the accused EA networks infringe because the accused EA networks share the same noninfringing feature that led to the finding that the NBA 2K network did not infringe in *Take-Two*—namely, that the accused network includes a server

participant that was connected to all of the other player participants. This makes the accused EA networks "essentially the same" as the NBA 2K network found noninfringing in *Take-Two*.

In *Take-Two,* as the Court observed, the "NBA 2K software uses a 'Park Relay Server,' which connects to players' computers or consoles and allows them to play each other." *Take-Two* at *9. Take-Two argued that, in the accused networks, "there might be 40 players in a network each connected to four players, but the Park Relay Server would be connected to all 40 players" and thus "the network is not m-regular because one participant (the server) is connected to a different number of neighbors than the other participants are." *Id*. In response, Acceleration argued that the server was not a participant in the application layer network Acceleration accused of infringement. *Id.*; 455 D.I. 490 at 90:10-22 ("THE COURT: But, I mean, the keyword is participant. So you're saying [the server is] not a participant? *** MR. FRANKEL: It's not a participant in the game. THE COURT: Okay. But is it a participant in the network? MR. FRANKEL: It's a participant — so it's a participant at the network layer, but not at the application layer.").

The Court squarely rejected Acceleration's argument, noting that the server is a "participant in the network because it transfers data back and forth between other network participants." *Take-Two* at *9.[2] The Court observed that the "claims are directed to network management, so what matters is whether the server is a participant in the network, not whether it is making jump shots or grabbing rebounds." *Id*. The Court also noted that Plaintiff's own expert report stated that the servers "are participants in the NBA 2K Mesh Network because they can equally send and receive heartbeat data, lockstep data, gameplay data, and VoIP data to other

---

[2] This is of course consistent with the stipulated construction of "participant" to be "a computer and/or computer process that participates in a network." D.I. 288 at 2.

9

participants in the network." *Id.* The Court therefore concluded that "there is no genuine dispute that the servers are participants in the NBA 2K networks, and the networks do not literally meet the m-regular limitation of the asserted claims." *Id.* Indeed, the Court observed that "the architecture of the NBA 2K network, which relies on a central relay server, is fundamentally different from the m-regular networks of the asserted claims." *Id.* at *10.

The issue is the same here and Acceleration is therefore precluded from asserting infringement as to the accused EA networks.

Here—as in *Take-Two*—Acceleration's attorneys and experts acknowledge that the accused games use a client-server network where the server is connected to the player participants but argue that the alleged infringement is occurring at the "application layer." *See, e.g.,* D.I. 429, Ex. A-3 (Medvidović reply report) at ¶ 37 ("the Asserted Patents are directed to an application layer network overlaying an underlying physical network…. Dr. Kelly erroneously focuses on the underlying client-server network and not the application layer overlay."); 455 D.I. 464, Ex. A-5 (Medvidović reply report) at ¶ 171 (same).

Here—as in *Take-Two*—Acceleration offers attorney argument that the server is not a participant in the "application layer network" accused of infringement, at least some of the time. D.I. 467 (Acceleration MSJ opposition brief) at 5 (Acceleration's experts "did not say that the server is a participant in the application layer *at all times*") (emphasis modified); *Take-Two* at *9 ("Plaintiff counters that the server is not a participant in the game."); 455 D.I. 490 at 90:10-22. Acceleration takes the position that the server is not always a participant in this case for the same reason it took the position that the server was never a participant in *Take-Two*.

And here—just as in *Take-Two*—Acceleration's argument is flatly contradicted by its own experts. In *Take-Two*, Acceleration's experts freely admitted that the server was a participant in

the accused network. *See Take-Two* at *9 ("Dr. Mitzenmacher, Plaintiff's own expert, wrote that the relay servers 'are participants'"). This expert admission contradicted Acceleration's attorney argument that the server was not a participant. *See id*. So too here. Acceleration's attorneys argue that the EA's DirtyCast server is sometimes a participant and sometimes not. D.I. 467 at 5 ("The server is only a participant in the overlay network 'when it applies game logics and selectively forwards data'") (quoting Medvidović opening report at ¶ 79) But when Dr. Medvidović was asked this exact question about this exact statement in his report during his deposition, he answered: "No. It's always a participant":

> Q. So I'd like to go to Paragraph 79.
> A. Of which exhibit?
> Q. Of your opening report. Sorry.
> A. Thank you.
> Q. So we've looked at most of this already, but in the sixth line of that paragraph—actually, I'll start at the fifth line so it's a complete thought:
> "The DirtyCast server is part of the underlying network and is also a participant in the application overlay FIFA Network when it applies game logics and selectively forwards data as I explain further below."
> By using the word "when," ***are you trying to say that the DirtyCast server is sometimes a participant and sometimes not***?
> A. ***No. It's always a participant***, but the way it participates is by applying the game logics and selectively forwarding data.

D.I. 434, Ex. E-9 (Medvidović deposition tr.) at 93:3-23 (emphasis added); *See also, e.g.* D.I. 428, Ex. A-1 (Medvidović opening report) at ¶¶ 2, 79, 86, 93; D.I. 429, Ex. A-3 (Medvidović reply report) ¶¶ 39, 73.

This Court's reliance on the actual evidence to resolve the inconsistency between the arguments of Acceleration's counsel and the evidence provided by Acceleration's experts is directly applicable here. The Court held that Acceleration's experts were right, the server *is* a participant "because it transfers data back and forth between other network participants." *Take-Two* at *9. So too here. The DirtyCast server is a participant because it receives data (like voice

data) from all the players, decides which data to package together (like the first four speakers in voice squelching), and transmits the received data back out to all the players. *See* D.I. 428, Ex. A-1 (Medvidović opening report) at ¶¶ 154, 168, 177, 193 ("When [the] DirtyCast [the server] detects that there are four VoIP streams being directed to a participant, it will prevent additional VoIP data from being sent to that participant at that time. EA refers to this process as 'voice squelching.'") (internal citations omitted). If the server were not a participant, there would be no way to apply voice squelching. Thus, here—as in *Take-Two*—the server is a participant because it "transfers data back and forth between the other network participants." Just as the Court observed in *Take-Two* that the server is a participant in the network even though it's not shooting baskets, the EA DirtyCast server is a participant even though it's not playing soccer, hockey, or shooting zombies. As the Court observed, the patents go to the network, and the server is unquestionably a participant in the network.

But even if the server were only sometimes a participant, the Court's opinion in *Take-Two* says that would not be enough. In *Take-Two*, this Court acknowledged that "[i]t might be true that GTAO players are sometimes, or even often, connected to the same number of other players." *Take-Two* at *8. But that was not enough. Acceleration needed—and failed—to present evidence that "suggest[s] [m-regular] is the default state of the network or that the network is in that state substantially all the time." *Id.* Acceleration had no evidence that the default state of the network was m-regular in *Take-Two* and it has no evidence of that here.

Thus, the accused games cannot infringe the "m-regular" claim limitation. As shown, the issue of whether the server is a participant is the same in this case as in *Take-Two*. This is just like *Transocean*, where the patent owner was estopped from alleging infringement of a rig with a casing sleeve because the casing sleeve was the feature that made the rig noninfringing in the first case.

*Transocean*, 617 F.3d at 1311-12. The first element of the collateral estoppel test, whether the issues are the same, is therefore met for Acceleration's literal infringement allegation.

> ### 3.     Acceleration is Estopped From Asserting Infringement Where The Connections Are Influenced By Player Decisions or Are Alleged to "Converge" to an m-regular Network.

Acceleration's literal infringement claims are also estopped because its arguments for how the alleged "application layer overlay" networks meet the m-regular claim limitation are the same in both cases. In both cases, they fail to describe a network that is configured to be m-regular in a default condition. In other words, Acceleration is estopped because the allegedly infringing features of the accused EA networks are essentially the same as those found non-infringing in *Take-Two*—namely, that the accused network is allegedly m-regular because of player decisions and various "rules and constraints." This is a separate and independent basis to find that Acceleration's literal infringement claims are estopped.

In the *Take-Two* case, for the accused GTAO game, Acceleration argued that the game "applies various rules and constraints that cause the gameplay network to converge to the same number of connections for each participant." *Take-Two* at *7. This Court held that this theory did not show m-regularity because it is not enough to show that the participants "are sometimes, or even often, connected to the same number of other players" *Id.* at *8. Instead, Acceleration needed to provide evidence that m-regularity "is the default state of the network" such "that if the network falls out of the m-regular state, the network responds by immediately trying to return to that configuration." *Id.*

In addition, "[p]art of [Acceleration's] theory was that GTAO transfers data based on the players' positions in the virtual world" because "[w]hen two players' avatars are closer together, there is a higher rate of data exchange between those two players." *Id.* at *7. But, again, the Court held that this theory "does not suggest that the network is m-regular." *Id.* at *8. Instead, this showed

"that the players' actions determine how connections are formed, and the network is not 'configured to maintain' any particular state." *Id.*

Here, Acceleration presents the same theories from its experts, often using the exact same wording, to claim that the EA's networks may or may not be m-regular depending on the players' actions in the game.

*First*, Acceleration argued that the networks used by the EA games were m-regular because they are "configured to converge to the same number of connections" and because they "apply logics rules in the selective distribution of gameplay data." D.I. 467 (Acceleration MSJ opposition brief) at 3-4; D.I. 428, Ex. A-1 (Medvidović report) ¶ 2; D.I. 429, Ex. A-3 (Medvidović reply report) at ¶ 38. The Court found these very same accused features did not meet the Court's claim construction in *Take-Two*. The Court observed that Acceleration's experts "have not identified any source code that directs the participants to connect to the same number of other participants" and that these allegations do not show that the "default state" of the network is m-regular or that it is "in that state substantially all the time." *Id.* at *8. That is precisely the case here. For each accused game, Dr. Medvidović says that "logics rules govern the selective direct distribution of gameplay and VoIP data and these logics case [*sic*] the [accused games] to converge to an optimal number of neighboring peer application programs to which a peer application program can send messages." D.I. 429, Ex. A-3 (Medvidović reply report) at ¶ 91. But—as in *Take-Two*—Dr. Medvidović never identifies "any source code that directs the participants to connect to the same number of participants" or show that the "default state" of the accused network is m-regular. Accordingly— as in *Take-Two*—Acceleration's argument that the accused games are "configured to converge to the same number of connections" and apply "logics rules" cannot show infringement of the m-regular limitation.

14

*Second*, Acceleration argued that the EA's use of voice squelching "limit[s] the number of connections for each participant to exactly four." D.I. 467 (Acceleration MSJ opposition brief) at 4. Acceleration's counsel reiterated this theory at the recent case management conference: "in EA … voice squelching … makes the network Four-Regular." D.I. 579 (11/4/21 hearing tr.) at 23:9-13. To understand this infringement theory, it will be helpful to review what Acceleration's experts say about voice squelching.

In the accused games, when players choose to speak, their voice data is sent to all the other players in the game. Voice squelching only comes into play when multiple players happen to speak at the same time (i.e., sending voice data to the server at the same time). When that occurs, voice squelching will only send out four players' voice data to avoid a cacophony. If more than four players are speaking, the voice data from those other players is not sent. This is not disputed. For example, Acceleration's expert described voice squelching in this manner at least four times in his report: "When [the] DirtyCast [server] detects that there are four VoIP streams being directed to a participant, it will prevent additional VoIP data from being sent to that participant at that time. EA refers to this process as 'voice squelching.'" D.I. 428, Ex. A-1 (Medvidović opening report) at ¶¶ 154, 168, 177, 193 (internal citations omitted). In other words, if more than four players in a game choose to speak at the same time (i.e., send voice data to the DirtyCast server at the same time), the server will only broadcast out the voice data from the first four of those speakers. Notably, not even Acceleration contends an m-regular network would form if fewer than 4 players decided to talk at the same time.

This feature is similar to the "proximity connection" feature of GTAO that the Court found did not meet the m-regular limitation in *Take-Two*. There, Acceleration argued that GTAO included "proximity connection rules" that transferred more data when two players' avatars are

closer together in the virtual world. *Take-Two* at *7. According to Acceleration, the "proximity connection rules will cause the network to form m-regular graphs." *Take-Two* at *7. The Court found that no reasonable jury could find the "proximity connection rules" could make the networks m-regular. *Id.* at *8. "The fact that players share more data when they are near each other does not suggest that the network is m-regular." *Id.* "Instead, it suggests that the players' actions determine how connections are formed, and the network is not 'configured to maintain' any particular state." *Id.*

Here—as in *Take-Two*—the players' actions determine whether voice squelching is activated. It is certainly not the "default state of the network" or that the accused network "is in that state substantially all the time." *Take-Two* at *8. If no players talk, or even if one, two, three, or four players talk, voice squelching is not activated and there is no m-regular network under Acceleration's theory. Under Acceleration's theory, only when five players try to talk at the same time does an m-regular network form and that network exists only so long as more than four players are trying to speak at the same time. This is exactly like the non-default, transitory, player-generated m-regular network theory that this Court found lacking in *Take-Two*.

Moreover, even under Acceleration's theory, the DirtyCast server is connected to all participants, and it decides whether to implement voice squelching. D.I. 428, Ex. A-1 (Medvidović opening report) at ¶¶ 154, 168, 177, 193. The DirtyCast server then determines which four voices to pass to all participants in the network. Even in that situation, the DirtyCast server is a participant because it is passing the voice data back and forth. As the DirtyCast server is connected to all participants, the network cannot be m-regular for this additional reason.

Thus, Acceleration's "converges" and "rules and constraints" infringement theories in this case are the same as its theories in *Take-Two*. The first element of the collateral estoppel test,

whether the issues are the same, is therefore met for Acceleration's literal infringement allegation for this independent reason.

### 4.     Acceleration's m-regular Doctrine of Equivalents Theory Is Barred

In *Take-Two*, the Court also rejected Acceleration's theory that the m-regular limitations were infringed under the doctrine of equivalents. *Id.* at *8-9, *10. The Court held Acceleration's equivalents theory was improper because it "effectively reads the m-regular limitation out of the patent." *Id.* at *9 (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)). The Court further held that the doctrine of equivalents theory was "especially weak for the '344, '966, and '147 patents because the patentee added the m-regular limitation during prosecution." *Id.* at *9. Because of this amendment, Acceleration "is barred by prosecution history estoppel from now attempting to erase that limitation from the patents." *Id.* (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002). Acceleration's similar doctrine of equivalents theory for NBA 2K "fails for the same reason it fails when applied to GTAO." *Id.* at *10.

That *Take-Two* prosecution history estoppel ruling applies to the '344, '966, and '147 patents. *Take-Two* at *9. Because prosecution history estoppel rests entirely on facts found in the prosecution history and not on the patentee's infringement allegations, the issues are *exactly* the same in both cases and thus the doctrine of equivalents claims against EA are estopped. Estoppel also applies because the features of the accused EA games alleged to infringe by equivalents are essentially the same as those rejected by this Court for both NBA 2K and GTAO. In both cases, Acceleration's experts used nearly identical language in alleging infringement by equivalents. In both cases, the experts opined that the accused games met the function/way/result test because the networks "relay … data efficiently so as to not overload a particular software application node on the network" and because "data are distributed in a balanced fashion" such that "no node is

overloaded and data are efficiently distributed." D.I. 428, Ex. A-1 (Medvidović opening report) at ¶¶ 199-201; 211-213; 226-228; 455 D.I. 464, Ex. A-1 (Medvidović opening report) at ¶¶ 192-194. Thus, because the accused features are essentially the same in both cases, estoppel applies. The first element of the collateral estoppel test, whether the issues are the same, is therefore met for Acceleration's equivalents infringement allegation.

### B.   The Remaining Elements of Collateral Estoppel Are Met

Application of the remaining elements of collateral estoppel is straightforward. Under the second and third elements, the issue was "actually litigated" and "determined by a final valid judgment" because the *Take-Two* non-infringement decision was a final decision of this Court that has been affirmed by the Federal Circuit. *Acceleration Bay*, 15 F.4th 1069. And, under the fourth element, the holding that the accused video games did not infringe the "m-regular" limitation was essential to the judgment of non-infringement of the '344, '966, '147, even though the *Take-Two* judgment had two alternative bases for the '344 and '966 patents. In the Third Circuit, collateral estoppel is available for the '344 and '966 patents even though that the judgment was reached through alternative findings. *See Jean Alexander*, 458 F.3d at 255 ("independently sufficient alternative findings should be given preclusive effect."). Even if that were not the case, the judgment that the m-regular limitation was not infringed by the accused video games was essential because it was the only basis for the judgment of non-infringement of the '147 and '069 patents in *Take-Two*. Hence, the finding of no infringement of the m-regular limitation was essential to the judgment, regardless of what Circuit law is applied, and all three remaining elements of collateral estoppel are met.

VI. **Even Absent a Collateral Estoppel Holding, this Court Should Grant Summary Judgment of No Infringement**

For the reasons discussed above, even if this Court finds that collateral estoppel does not apply, EA still respectfully requests that the Court grant summary judgment of no infringement. As explained above, Acceleration's infringement theories in this case are indistinguishable from those rejected by this Court in *Take-Two*. And the correctness of the Court's reasoning in *Take-Two* is shown by Acceleration's decision not to appeal those key decisions. Because no reasonable jury could find infringement under Acceleration's theories, there are no genuine fact issues for trial on infringement, and the Court should grant summary judgment.

VII. **The Court Already Granted Summary Judgment on Acceleration's '497 Patent Allegations.**

To the surprise of EA (and perhaps the Court), Acceleration's counsel asserted at the status conference that the '497 patent was still at issue in this case. D.I. 579 (11/4/21 hearing tr.) at 16:1-17:16. It is not. The Court has already granted summary judgment on the '497, holding that there is no evidence for Accelerations' claims that EA's Blaze Redirector, asserted to be the sole infringing instrumentality, performs the operations required in the claim. In its opposition brief, Acceleration pointed only to portions of its experts' report, but the Court found that "[t]here is nothing in the cited portions of the report that might support a finding that the Blaze Redirector is the 'means for selecting the call-in port of the identified portal computer using a port ordering algorithm.'"). *EA* at *5. Acceleration only alleges infringement of the '497 patent through the Blaze Redirector. *Id.* at *4. Indeed, at the hearing the Court asked Acceleration to confirm this was their exclusive argument, to which Acceleration's counsel agreed. D.I. 525 (2/28/19 hearing tr.) at 36:3-17. When Acceleration could point to no evidence that the only device it accuses of infringement contains an element of the asserted '497 patent claims, the Court granted summary

19

judgment in EA's favor on the '497 patent. This holding is not limited to making, selling, offering to sell, or using (for testing) the patent.

Despite this clear holding, Acceleration asserts that the Court has not disposed of the '497 patent. D.I. 579 (11/4/21 hearing tr.) at 16:1-17:16. It argues that the Court's holding applies only to "making," not "using." *Id.* at 16:20-21. Acceleration apparently thinks this is the case because the holding was found under the heading "2. Making," and not repeated under the heading of "1. Use." *See EA* at *3-5. But regardless of the heading under which the holding was found, the Court found there was no evidence that the accused Blaze Redirector contained "a means for selecting the call-in port of the identified portal computer using a port ordering algorithm." *Id.* at *5. As at least that claim limitation is missing, there is no infringement of the asserted claims. That holding is just as fatal to Acceleration's "using" allegation as it is to Acceleration's "making" allegation. If there is no evidence that the Blaze Redirector is made to perform that function, there can be no evidence that using it would perform that function. In any event, Acceleration never provided evidence of such, as the Court noted. The Court has already granted summary judgment of noninfringement on the '497.

## VIII.  Conclusion

EA's motion for summary judgment of noninfringement should be granted, and the case should be dismissed.

OF COUNSEL:

David P. Enzminger
Michael A. Tomasulo
Gino Cheng
Joe S. Netikosol
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
(213) 615-1700

Louis L. Campbell
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
(650) 858-6500

Daniel K. Webb
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

Joseph C. Masullo
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000

November 22, 2021

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____
Jack B. Blumenfeld (#1014)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 22, 2021, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan A. Choa, Esquire
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801
*Attorneys for Plaintiff*

Paul J. Andre, Esquire                                       *VIA ELECTRONIC MAIL*
Lisa Kobialka, Esquire
James Hannah, Esquire
Hannah Lee, Esquire
Yuridia Caire, Esquire
Greg Proctor, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
*Attorneys for Plaintiff*

Aaron M. Frankel, Esquire                                    *VIA ELECTRONIC MAIL*
Marcus A. Colucci, Esquire
Cristina Martinez, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
*Attorneys for Plaintiff*

*/s/ Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)